Kevin S. Wiley, Jr.
State Bar No. 24029902
**HICKS LAW GROUP PLLC**
325 N. St. Paul Street, Suite 4400
Dallas, Texas  75201
Tel. (469) 619-5721
Fax (469) 619-5725
**COUNSEL FOR**
**CJ PROJECT MANAGEMENT, INC.**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **BSPV-PLANO, LLC** | § | **CASE NO. 22-40276-BTR** |
|   Debtor | § | **CHAPTER 11** |

| | | |
|---|---|---|
| **CJ PROJECT MANAGEMENT, INC.** | § | |
|   Plaintiff | § | |
| | § | **Adversary No.: _____** |
| **vs.** | § | |
| | § | |
| **BSPV-PLANO, LLC, RICHARD SHAW,** | § | |
| **Individually, and NORTH SOUTH** | § | |
| **BUILDING, LLC** | § | |
|   Defendants | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE  BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY COURT JUDGE:

COMES  Now,  CJ  Project  Management,  LLC  d/b/a  CJ  Project  Management

(Plaintiff), to file this Original Complaint and respectfully shows the Court as follows:

**I. JURISDICTION**

1.     This Court has jurisdiction over this adversary proceeding pursuant to 28

U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. 157(b)(2)(B), and

(O). This proceeding is an action to recover money or property from BSVP-Plano, LLC

(Debtor or BSPV), Defendant Richard Shaw (Shaw), and Defendant North/South Building, LLC (North/South) (BSPV, Shaw and North/South are collectively known as the Defendants), and to determine the validity, priority, or extent of lien or other interest in property, pursuant to Fed. R. Bank. P. 7001(1),(2).

2.      The Court has personal jurisdiction over the Defendants because the Defendants reside or are doing business in the Eastern District of Texas or have substantial contact within the Eastern District of Texas such that general or specific jurisdiction exists over the Defendants.

## II. VENUE

3.      This Complaint relates to the Debtor's bankruptcy case, which was filed under Chapter 11, Subchapter V, of the United States Code, 11 U.S.C. §§ 101, et. seq. (Bankruptcy Code), in the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division. Venue is proper in this District and this Division pursuant to 28 U.S.C. § 1409(a).

## III. PARTIES

4.      Plaintiff CJ Project Management, Inc. d/b/a CJ Group is a Texas Corporation with its principal place of business in Tarrant County, Texas.

5.      BSPV is a Texas limited liability company and is the debtor in this case.

6.      Richard Shaw is a managing member of BSPV and can be served with process at Richard Shaw's place of employment at 4851 Keller Springs Road, Suite 209, Addison, TX 75001, or wherever Richard Shaw may be found.

7      North/South Building is a Texas Limited Liability Company with its principal place of business in Dallas County, Texas, and may be served with notice

through their attorneys, Joseph J. Mastrogiovanni, Jr., at Mastrogiovanni Mersky & Flynn,

P.C., 2001 Bryan Street, Suite 1250, Dallas, TX 75201, and Greg Harwell, at Slates

Harwell, LLP, 1700 Pacific, Suite 3800, Dallas, TX 75201, or by serving its Registered

Agent, Richard Shaw, at 17103 Preston Rd., Ste. 250, Dallas, Texas 75248, or at Richard

Shaw's place of employment at 4851 Keller Springs Road, Suite 209, Addison, TX 75001,

or wherever Richard Shaw may be found.

## IV. FACTS

### PLAINTIFF'S SUBCONTRACT WITH BSPV

8.      In November of 2018, CJ Group entered into an AIA 401 Subcontract

(Subcontract) to perform framing work on a project known as Bridgemoor Plano, 1100

Park Vista Road, Plano, Texas (Project).  The Project is the main asset of the Debtor

consisting of 23 residential buildings (22 smaller buildings, and 1 large 3 story building), 1

clubhouse, 1 mechanical building, and 6 garages.  The CJ Group proposal dated November

1, 2018, which defines the work to be performed by CJ Group, is specifically incorporated

into the Subcontract agreement.  The proposal clarifies that CJ Group agreed to frame

330,073 square feet of building(s) in exchange for payment in the amount of

$2,050,000.00.  A true and correct copy of the Subcontract is attached as Exhibit A, and is

incorporated herein by reference for all purposes.  North/South was required to provide all

of the framing materials except nails and equipment.

9.      Defendant, North/South Building is the general contractor for the Project

and the Debtor is the Project owner.  North/South Building and the Debtor, upon

information and belief, are under common ownership and control. Richard Shaw is

President, Director, and Secretary for North/South Building and the Debtor is partially

owned by RP Shaw Investments LLC. Richard Shaw is a managing member of RP Investments and holds the titles of President, Director, and Secretary for that entity.

### PLAN DISCREPANCY REGARDING SQUARE FOOTAGE FOR FRAMING

10.     The drawings provided to CJ Group for bid contained a summary of the square footage for the project which was 330,073 sq. ft.  Once CJ Group began work on the Project in May of 2019, it became clear that the actual square footage of the Project that would need to be framed was substantially more than the 330,073 sq. ft. indicated on the plans.  Since CJ Group's Subcontract was only for 330,073 sq. ft. of framing, it asked for clarification from North/South.   North/South contacted the architect of record who subsequently provided an updated square footage summary which indicates that Project involved 417,986 sq. ft. for framing, a difference of 87,913 sq. ft. from what was indicated on the bid plans.  CJ Group has reason to believe that Owner knew the square footage summary on the bid plans provided to CJ Group was incorrect, and may have been intentionally trying to mislead parties bidding the Project.

11.     CJ Group promptly presented the North/South with Change Order No. 2 for framing the additional square footage.  North/South never questioned or disputed Change Order No. 2, and indicated by text message that it would be providing an AIA form change order rather than the form provided by CJ Group.  The AIA change order was never provided.  North/South's project personnel acknowledged on site that the square footage summary on the plans was incorrect and that CJ Group should be paid for the extra contractual work.  Thereafter, Change Order No. 2 was incorporated into the CJ Group payment applications, and several payment applications which included this change order as part of the adjusted contract price were approved and paid by North/South.

PROJECT DELAYS

12.     The Subcontract was signed in November 2018, and work was supposed to start in February of 2019.  CJ Group never received a formal notice to proceed and North/South failed to provide a Project schedule.  North/South did not start pouring slabs until May of 2019 to permit CJ Group to mobilize and initiate its scope of work.  There was no visible schedule or organization regarding slab placement, and CJ Group could not proceed with vertical framing and was working with a skeleton crew.  CJ Group had to pay its subcontractors to keep them available starting in May 2019, even though North/South continued to fail to have the Project ready for vertical framing.  North/South poured the slabs without fire lanes, and in no rational order.  The Project has five buildings and one garage on one side of the street.  North/South finally released this portion of the Project for framing and CJ Group provided a full crew of approximately 30 to start framing.  Six hours into initiating its work, CJ Group received a notice from the fire marshal to stop construction until North/South and the Debtor resolved the fire lane issue. This delayed CJ Group's work on the Project for over 5 months.

13.     North/South was also failing to timely provide the material necessary for CJ Group to perform its framing work, and had no set schedule or plan to ensure that the material would be provided when it was needed on site.  In May 2019, CJ Group proactively provided a schedule to let North/South know when it needed materials to be able to progress its work.  All of the material for each Project building should have been delivered together, and placed near the slab for the building.  North/South did not comply with the schedule provided by CJ Group, and the delays in providing material, specifically trusses, continued.  CJ Group continued its work as best it could from May 2019, through

September of 2020.  CJ Group suffered substantial Owner/North/South caused delays on the Project.

### NON-PAYMENT AND WRONGFUL TERMINATION

14.     CJ Group submitted its July 2020, payment application (Pay App. 7) which North/South refused to pay.  CJ Group never received any notification from North/South that Pay App. 7 was disputed in any way.  When CJ Group asked about payment, North/South's personnel indicated that CJ Group would need to talk to Richard Shaw.  CJ Group attempted to contact or meet with Mr. Shaw on several occasions, but was always rebuffed.  Meanwhile, framing work on the Project continued.  CJ Group subsequently submitted payment applications for August and September, 2020 which also remained unpaid.

15.     During the period from July through September when North/South/Owner failed to pay, CJ Group never received any kind of notice of default or any indication of issues with its work.  Ike Chukwura, owner of CJ Group, went to the Project site on September 14, 2020.  The Owner, Mr. Shaw was also on site.  Mr. Shaw told Mr. Chukwura to leave the property. An employee of North/South then blocked Mr. Chukwara from leaving the Project, and called the police.  Mr. Shaw told the police that Mr. Chukwara was trespassing despite the fact that CJ Group had every right to be on the jobsite.

### SHAM RELATIONSHIP BETWEEN OWNER AND NORTH/SOUTH

16.     North/South and the Debtor are under common ownership and control. Richard Shaw is President, Director, and Secretary for North/South. As noted in the Debtor's Schedules filed with the Court, RP Shaw Investments LLC owns 49% of the

membership interest in the Debtor.  Richard Shaw is a managing member of RP Shaw Investments, LLC and is listed as its President, Director, and Secretary.  Any contract between Debtor and North/South is a sham relationship pursuant to TEX. PROP. CODE §53.026(a)(1) and pursuant to TEX. BUS. & COM. CODE §56.053.

### MECHANIC'S LIENS

17.    CJ Group properly perfected two mechanic's liens: Affidavit for Mechanic's and Materialman's Lien filed and recorded in Collin County on September 15, 2020, as document number 20200915001562140; and Affidavit for Mechanic's and Materialman's Lien filed and recorded in Collin County on October 14, 2020, as document number 20201014001785140 (collectively the Liens).  A true and correct copy of the Lien dated September 15, 2020, is attached as Exhibit B, and is incorporated herein by reference for all purposes. A true and correct copy of the Lien dated October 14, 2020, is attached as Exhibit C, and is incorporated herein by reference for all purposes.

18.    After application of all lawful credits and offsets, the principal amount of $1,282,519.15, is due to CJ Group for the Subcontract Work in place at the Project.  CJ Group has also been damaged by forced inefficiency and interruption of its performance by Defendants.  CJ Group also seeks to recover all applicable interest, attorneys' fees, costs, and expenses pursuant to the Subcontract and/or applicable law.

## V. CAUSES OF ACTION

### Count One: Misapplication of Trust Funds

19.    Each of the foregoing paragraphs is incorporated here by reference for all purposes.

20.    Pursuant to §162.003 of the Texas Property Code, Richard Shaw and

Debtor are trustees of trust funds -- specifically the construction payments Debtor received

from its lender, and payments North/South was paid by Debtor for its and CJ Group's

work on the Project. Richard Shaw and Debtor misapplied such funds by diverting the

same without first paying all current or past due obligations incurred by the trustees to the

beneficiaries of the trust – namely CJ Group – and any other unpaid subcontractors that

performed work on the construction Project.  CJ Group therefore seeks damages from

Richard Shaw, the Debtor, and North/South for the construction payments the Debtor,

North/South and Richard Shaw failed to pay CJ Group that Debtor received from its lender

and paid North/South in the total principal amount of at least $1,282,519.15.

21.     CJ Group has been damaged in an amount in excess of the jurisdictional

limits of the Court and is entitled to recover.

22.     The misapplication of trust funds was committed by Debtor, Richard Shaw,

and North/South with intent to defraud, as defined by §162.005(1)(A) of the Texas

Property Code, or alternatively, through fraud, malice, gross negligence or as the result of

willful misconduct, thus entitling CJ Group to exemplary damages against Debtor, Richard

Shaw, and North/South pursuant to Chapter 41 of the Texas Civil Practice & Remedies

Code.

### Count Two: Claim for Statutory Retainage & Trapped Funds

23.     Each of the foregoing paragraphs is incorporated here by reference for all

purposes.

24.     On numerous occasions, including or about September 4, 2020, September

14, 2020, and October 14, 2020, CJ Group sent notice to North/South and Debtor of the

unpaid balance due for the labor CJ Group furnished to the Project.  Said notice contained

the statutory language required by Sections 53.056(d) and 53.057 of the Texas Property Code. In addition, CJ Group filed its lien affidavits on or about September 15, 2020, and October 14, 2020, and sent timely notice to North/South and Debtor of the same on or about September 16, 2020, and October 15, 2020, respectively.

25.     At the time CJ Group gave such written notifications to Debtor, Debtor was required pursuant to Section 53.101 of the Texas Property Code to retain ten percent (10%) of its contract amount with North/South or ten percent (10%) of the value of the work measured by the proportion that the work done bears to the work to be done, for the benefit of CJ Group and other qualified claimants. This retainage is in addition to any other funds trapped pursuant to Section 53.056(d) of the Texas Property Code.

26.     On information and belief, BSPV-Plano has not retained the legally required retainage amount and/or has prematurely paid out portions of retainage or otherwise improperly drew upon retainage in violation of Subchapter E of the Texas Property Code. BSPV-Plano is therefore personally liable and its property subject to CJ Group's liens in the principal amount of at least $1,282,519.15.

**Count Three: Declaratory Judgment Regarding Mechanic's Liens**

27.     Each of the foregoing paragraphs is incorporated here by reference for all purposes.

28.     Debtor has challenged the validity and priority of the Mechanic's Liens. Pursuant to 28 U.S.C. §§ 2201(a) and 2202, and to the extent that any funds retained by the Debtor are not considered trust funds, CJ Group seeks a judgment declaring that the Mechanic's Liens are valid and CJ Group's claim should be allowed and treated as a secured claim.

29.     CJ Group provided the Subcontract Work including labor for siding and framing work, specifically labor, nails and equipment only to the Project.  The supplies and labor provided by CJ Group were used in the direct prosecution of the work to improve the above-described Project.

30.     CJ Group properly perfected the Liens on the Project pursuant to Chapter 53 of the Texas Property Code and/or Article 16, Section 37 of the Texas Constitution. The Liens remain unsatisfied. Should the Debtor fail to adequately assure payment of CJ Group's secured debt, CJ Group requests relief under Bankruptcy Rule 4001 to lift the automatic stay and allow CJ Group its remedies to foreclose the Mechanic's Liens under state law.

**Count Four: Alter Ego and Veil Piercing**

31.     Each of the foregoing paragraphs is incorporated here by reference for all purposes.

32.     The Debtor and Defendant, North/South are alter egos of Defendant, Richard Shaw. Alternatively, and to the extent that any portion of the Mechanic's Liens are deemed invalid, CJ Group should be allowed an unsecured claim against the Debtor for the full amount of Defendants' liabilities owed to CJ Group. Grounds for piercing the corporate veils among the Debtor and North/South exist to prevent them from using their corporate structures to perpetuate a fraud, evading existing obligations, circumventing statues, and attempting to justify wrongs.

33.     CJ Group seeks a claim against Defendants for the full amount of Debtor's debts to CJ Group.

## <u>CONCLUSION</u>

WHEREFORE, Plaintiff CJ Group requests that Defendants, BSPV-Plano, Richard Shaw, and North/South be cited to appear and answer herein and that CJ Group be granted judgment for:

(1)    Deficiency claim for damages in the principal amount of at least $1,282,519.15;

(2)    Declaratory Judgment that CJ Group's claim against the Debtor should be allowed as a secured claim with the perfection of its Mechanic's Liens;

(3)    reasonable and necessary attorneys' fees for pre-trial, trial and any subsequent appeal and petitions for review;

(4)    all costs of suit; and

(5)    all other relief to which Plaintiff may be entitled in law or equity.


Respectfully submitted,

**HICKS LAW GROUP PLLC**

/s/ Kevin S. Wiley, Jr.
Rebecca Hicks
State Bar No. 24025428
Kevin S. Wiley, Jr.
State Bar No. 24029902
325 N. St. Paul Street, Suite 4400
Dallas, Texas  75201
Tel:  (469) 619-5721
Fax:  (469) 619-5725
**Rhicks@HicksLawGroup.com**
KWiley@HicksLawGroup.com
COUNSEL FOR PLAINTIFF

# EXHIBIT A

# ☗AIA® Document A401™ – 2017

## Standard Form of Agreement Between Contractor and Subcontractor

**AGREEMENT** made as of the 12 day of November in the year 2018
*(In words, indicate day, month and year.)*

**BETWEEN** the Contractor:
*(Name, legal status, address and other information)*

North South Builder LLC
4851 Keller Springs Road #209
Addison, Tx 75001

and the Subcontractor:
*(Name, legal status, address and other information)*

CJ Group
2720 Explorador
Grand Prairie, Tx 75054

The Contractor has made a contract for construction (hereinafter, the Prime Contract) dated:

with the Owner:
*(Name, legal status, address and other information)*

BSPV-PLANO
4851 Keller Springs Road #209
Addison, Tx 75001

for the following Project:
*(Name, location and detailed description)*

Bridgemoor Plano
1100 Park Vista Road
Plano, Tx

The Prime Contract provides for the furnishing of labor, materials, equipment and services in connection with the construction of the Project. A copy of the Prime Contract, consisting of the Agreement Between Owner and Contractor (from which compensation amounts may be deleted) and the other Contract Documents enumerated therein, has been made available to the Subcontractor.

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document A201™–2017, General Conditions of the Contract for Construction, is adopted in this document by reference.

**AIA Document A401™ – 2017.** Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:51:43 ET on 11/12/2018 under Order No.7097645598 which expires on 09/03/2019, and is not for resale.
User Notes: (1112044856)

Init.

/

1

The Architect for the Project:
*(Name, legal status, address and other information)*

Ikemire Architexts
16660 North Dallas Parkway
Dallas, Tx

The Contractor and the Subcontractor agree as follows.

Complete framing of all buildings, clubhouse, maintenance and garage buildings.

Init.

/

**AIA Document A401™ – 2017.** Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:51:43 ET on 11/12/2018 under Order No.7097645598 which expires on 09/03/2019, and is not for resale.
User Notes:                                                                                      (1112044856)

2

**TABLE OF ARTICLES**

1      THE SUBCONTRACT DOCUMENTS

2      MUTUAL RIGHTS AND RESPONSIBILITIES

3      CONTRACTOR

4      SUBCONTRACTOR

5      CHANGES IN THE WORK

6      CLAIMS AND DISPUTES

7      TERMINATION, SUSPENSION OR ASSIGNMENT OF THE SUBCONTRACT

8      THE WORK OF THIS SUBCONTRACT

9      DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

10     SUBCONTRACT SUM

11     PAYMENTS

12     INSURANCE AND BONDS

13     TEMPORARY FACILITIES, SERVICES, EQUIPMENT AND WORKING CONDITIONS

14     MISCELLANEOUS PROVISIONS

15     ENUMERATION OF SUBCONTRACT DOCUMENTS

**ARTICLE 1  THE SUBCONTRACT DOCUMENTS**
§ 1.1 The Subcontract Documents consist of (1) this Agreement; (2) the Prime Contract, consisting of the Agreement between the Owner and Contractor and the other Contract Documents enumerated therein; (3) Modifications to the Prime Contract, whether issued before or after the execution of this Agreement, in accordance with the provisions of Article 5; (4) other documents listed in Article 15 of this Agreement; and (5) Modifications to this Subcontract issued after execution of this Agreement, in accordance with the provisions of Article 5. These form the Subcontract, and are as fully a part of the Subcontract as if attached to this Agreement or repeated herein.

§ 1.2 The Subcontract Documents form the Subcontract for Construction. The Subcontract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations, or agreements, either written or oral. An enumeration of the Subcontract Documents, other than Modifications to the Prime Contract or Modifications to this Subcontract issued subsequent to the execution of this Agreement, appears in Article 15.

§ 1.3 Except to the extent of a conflict with a specific term or condition contained in the Subcontract Documents, the General Conditions governing this Subcontract shall be the AIA Document A201™–2017, General Conditions of the Contract for Construction.

§ 1.4 The Subcontract may be amended or modified only by a Modification to this Subcontract. A Modification to this Subcontract is a written amendment to this Agreement signed by both parties, or as otherwise described in, and in accordance with the provisions of, Article 5.

§ 1.5 The Subcontract Documents shall not be construed to create a contractual relationship of any kind (1) between the Architect and the Subcontractor, (2) between the Owner and the Subcontractor, or (3) between any persons or entities other than the Contractor and Subcontractor.

**Init.**

**/**

**AIA Document A401™ – 2017.** Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:51:43 ET on 11/12/2018 under Order No.7097645598 which expires on 09/03/2019, and is not for resale.
User Notes:                                                                    (1112044856)

**3**

§ 1.6 The Contractor shall make the Subcontract Documents available to the Subcontractor prior to execution of this Agreement, and thereafter, upon request. The Contractor may charge the Subcontractor for the reasonable cost to reproduce the Subcontract Documents provided to the Subcontractor.

## ARTICLE 2   MUTUAL RIGHTS AND RESPONSIBILITIES

The Contractor and Subcontractor shall be mutually bound by the terms of this Agreement and, to the extent that the provisions of AIA Document A201–2017 apply to this Agreement pursuant to Section 1.3 and provisions of the Prime Contract apply to the Work of the Subcontractor, the Contractor shall assume toward the Subcontractor all obligations and responsibilities that the Owner, under such documents, assumes toward the Contractor, and the Subcontractor shall assume toward the Contractor all obligations and responsibilities that the Contractor, under such documents, assumes toward the Owner and the Architect. The Contractor shall have the benefit of all rights, remedies, and redress against the Subcontractor that the Owner, under such documents, has against the Contractor, and the Subcontractor shall have the benefit of all rights, remedies, and redress against the Contractor that the Contractor, under such documents, has against the Owner, insofar as applicable to this Subcontract. Where a provision of such documents is inconsistent with a provision of this Agreement, this Agreement shall govern.

## ARTICLE 3   CONTRACTOR
### § 3.1 General
§ 3.1.1 The Contractor is the person or entity identified as such in this Agreement and is referred to throughout the Subcontract Documents as if singular in number. The Contractor shall designate in writing a representative who shall have express authority to bind the Contractor with respect to all Project matters requiring the Contractor's approval or authorization. The term "Contractor" means the Contractor or the Contractor's authorized representative.

§ 3.1.2 The Contractor shall render decisions in a timely manner and in accordance with the Contractor's construction schedule.

### § 3.2 Services Provided by the Contractor
§ 3.2.1 The Contractor shall cooperate with the Subcontractor in scheduling and performing the Contractor's Work to avoid conflicts or interference in the Subcontractor's Work and shall review, and expedite written responses to, submittals made by the Subcontractor in accordance with Section 4.2.3 and Article 5. Promptly after execution of this Agreement, the Contractor shall provide the Subcontractor with copies of the Contractor's construction schedule and schedule of submittals, together with such additional scheduling details as will enable the Subcontractor to plan and perform the Subcontractor's Work properly. The Contractor shall promptly notify the Subcontractor of subsequent changes in the construction and submittal schedules and additional scheduling details.

§ 3.2.2 The Contractor shall provide suitable areas for storage of the Subcontractor's materials and equipment during the course of the Work. Except as previously agreed upon, additional costs to the Subcontractor resulting from relocation of such storage areas at the direction of the Contractor shall be reimbursed by the Contractor.

### § 3.3 Communications
§ 3.3.1 The Contractor shall promptly make available to the Subcontractor information, including information received from the Owner, that affects the performance of this Subcontract and that becomes available to the Contractor subsequent to execution of this Subcontract.

§ 3.3.2 The Contractor shall not give instructions or orders directly to the Subcontractor's employees or to the Subcontractor's Sub-subcontractors or suppliers unless such persons are designated as authorized representatives of the Subcontractor.

§ 3.3.3 The Contractor shall permit the Subcontractor to request information directly from the Architect regarding the percentages of completion and the amount certified for account of Work done by the Subcontractor.

§ 3.3.4 If hazardous materials or substances are being used on the site by the Contractor, a subcontractor, or anyone directly or indirectly employed by them (other than the Subcontractor), and they are a type of hazardous material or substance of which an employer is required by law to notify its employees, the Contractor shall, prior to delivery to the Project site or exposure of the Subcontractor's employees to such material or substance, give notice of the chemical

**Init.**

**/**

AIA Document A401™ – 2017. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:51:43 ET on 11/12/2018 under Order No.7097645598 which expires on 09/03/2019, and is not for resale.
User Notes:                                                                                      (1112044856)

**4**

composition thereof to the Subcontractor in sufficient detail and time to permit the Subcontractor's compliance with such laws.

§ 3.3.5 The Contractor shall promptly notify the Subcontractor of any fault or defect in the Work under this Subcontract or nonconformity with the Subcontract Documents.

§ 3.3.6 The Contractor shall furnish to the Subcontractor within 30 days after receipt of a written request, or earlier if so required by law, information necessary and relevant for the Subcontractor to evaluate, give notice of or enforce mechanic's lien rights. Such information shall include a correct statement of the record legal title to the property, usually referred to as the site, on which the Project is located and the Owner's interest therein. If the Contractor does not have such information, the Contractor shall request the information from the Owner in accordance with Article 2 of AIA Document A201-2017 and promptly furnish the information received from the Owner to the Subcontractor.

§ 3.3.7 If the Contractor asserts a Claim against, or defends a Claim by, the Owner that relates to the Work of the Subcontractor, the Contractor shall promptly make available to the Subcontractor all information relating to the portion of the Claim that relates to the Work of the Subcontractor.

### § 3.4 Claims by the Contractor
§ 3.4.1 Liquidated damages, if provided for in the Prime Contract, shall be assessed against the Subcontractor only to the extent caused by the Subcontractor or any person or entity for whose acts the Subcontractor may be liable, and in no case for delays or causes arising outside the scope of this Subcontract.

§ 3.4.2 The Contractor's Claims for the costs of services or materials provided due to the Subcontractor's failure to execute the Work shall require
    .1    seven days' notice prior to the Contractor's providing services or materials, except in an emergency; and
    .2    written compilations to the Subcontractor of services and materials provided by the Contractor and charges for such services and materials no later than the fifteenth day of the month following the Contractor's providing such services or materials.

### § 3.5 Contractor's Remedies
If the Subcontractor defaults or neglects to carry out the Work in accordance with this Agreement and fails within five working days after receipt of notice from the Contractor to commence and continue correction of such default or neglect with diligence and promptness, the Contractor may, without prejudice to other remedies the Contractor may have, remedy such default or neglect and withhold, in accordance with Section 11.1.7.2, the reasonable cost thereof from current or future payments due the Subcontractor. If payments due to the Subcontractor are not sufficient to cover such amounts, the Subcontractor shall pay the difference to the Contractor.

### ARTICLE 4   SUBCONTRACTOR
### § 4.1 General
The Subcontractor is the person or entity identified as such in this Agreement and is referred to throughout the Subcontract Documents as if singular in number. The Subcontractor shall be lawfully licensed, if required in the jurisdiction where the Project is located. The Subcontractor shall designate in writing a representative who shall have express authority to act on the Subcontractor's behalf with respect to the Project. The term "Subcontractor" means the Subcontractor or the Subcontractor's authorized representative.

### § 4.2 Execution and Progress of the Work
§ 4.2.1 For all Work the Subcontractor intends to subcontract, the Subcontractor shall enter into written agreements with Sub-subcontractors performing portions of the Work of this Subcontract by which the Subcontractor and the Sub-subcontractor are mutually bound, to the extent of the Work to be performed by the Sub-subcontractor, assuming toward each other all obligations and responsibilities that the Contractor and Subcontractor assume toward each other and having the benefit of all rights, remedies and redress each against the other that the Contractor and Subcontractor have by virtue of the provisions of this Agreement.

§ 4.2.2 The Subcontractor shall supervise and direct the Subcontractor's Work, and shall cooperate with the Contractor in scheduling and performing the Subcontractor's Work to avoid conflict, delay in, or interference with the Work of the Contractor, other subcontractors, the Owner, or Separate Contractors.

**Init.**

**/**

AIA Document A401™ – 2017. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:51:43 ET on 11/12/2018 under Order No.7097645598 which expires on 09/03/2019, and is not for resale.
User Notes:                                                                                                      (1112044856)

**5**

### § 4.2.3 Submittals

§ 4.2.3.1 The Subcontractor shall submit Shop Drawings, Product Data, Samples, and similar submittals required by the Subcontract Documents with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of the Contractor or other subcontractors.

§ 4.2.3.2 By submitting Shop Drawings, Product Data, Samples, and similar submittals, the Subcontractor represents to the Contractor that the Subcontractor has (1) reviewed and approved them; (2) determined and verified materials, field measurements, and field construction criteria related thereto, or will do so; and (3) checked and coordinated the information contained within such submittals with the requirements of the Work and of the Subcontract Documents.

§ 4.2.4 The Subcontractor shall furnish to the Contractor periodic progress reports on the Work of this Subcontract as mutually agreed, including information on the status of materials and equipment that may be in the course of preparation, manufacture, or transit.

§ 4.2.5 The Subcontractor agrees that the Contractor and the Architect each have the authority to reject Work of the Subcontractor that does not conform to the Prime Contract. The Architect's decisions on matters relating to aesthetic effect shall be final and binding on the Subcontractor if consistent with the intent expressed in the Prime Contract.

§ 4.2.6 The Subcontractor shall pay for all materials, equipment, and labor used in connection with the performance of this Subcontract through the period covered by previous payments received from the Contractor, and shall furnish satisfactory evidence, when requested by the Contractor, to verify compliance with the above requirements.

§ 4.2.7 The Subcontractor shall take necessary precautions to properly protect the work of the Contractor, Separate Contractors, and other subcontractors from damage caused by operations under this Subcontract.

§ 4.2.8 The Subcontractor shall cooperate with the Contractor, other subcontractors, the Owner, and Separate Contractors whose work might affect the Subcontractor's Work. The Subcontractor shall participate in the preparation of coordinated drawings in areas of congestion, if required by the Prime Contract, specifically noting and advising the Contractor of potential conflicts between the Work of the Subcontractor and that of the Contractor, other subcontractors, the Owner, or Separate Contractors.

### § 4.3 Permits, Fees, Notices, and Compliance with Laws

§ 4.3.1 The Subcontractor shall give notices and comply with applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities bearing on performance of the Work of this Subcontract. The Subcontractor shall secure and pay for permits, fees, licenses, and inspections by government agencies necessary for proper execution and completion of the Subcontractor's Work, the furnishing of which is required of the Contractor by the Prime Contract.

§ 4.3.2 The Subcontractor shall comply with Federal, state, and local tax laws; social security acts; unemployment compensation acts; and workers' compensation acts, insofar as applicable to the performance of this Subcontract.

### § 4.4 Safety Precautions and Procedures

§ 4.4.1 The Subcontractor shall take reasonable safety precautions with respect to performance of this Subcontract. The Subcontractor shall comply with safety measures initiated by the Contractor and with applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities, for the safety of persons and property, in accordance with the requirements of the Prime Contract. The Subcontractor shall notify the Contractor within three days of an injury to an employee or agent of the Subcontractor which occurred at the site.

§ 4.4.2 If hazardous materials or substances are being used on the site by the Subcontractor, the Subcontractor's Sub-subcontractors, or anyone directly or indirectly employed by them, and they are a type of hazardous material or substance of which an employer is required by law to notify its employees, the Subcontractor shall, prior to delivery to the Project site or exposure of the Contractor, other subcontractors, and other employers on the site to such material or substance, give notice of the chemical composition thereof to the Contractor in sufficient detail and time to permit compliance with the laws by the Contractor, other subcontractors, and other employers on the site.

**Init.**

**/**

AIA Document A401™ – 2017. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:51:43 ET on 11/12/2018 under Order No.7097645598 which expires on 09/03/2019, and is not for resale.
User Notes:                                                                                                                    (1112044856)

**6**

§ 4.4.3 If reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a hazardous material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Subcontractor, the Subcontractor shall, upon recognizing the condition, immediately stop Work in the affected area and promptly report the condition to the Contractor in writing. When the material or substance has been rendered harmless, the Subcontractor's Work in the affected area shall resume upon written agreement of the Contractor and Subcontractor. The Subcontract Time shall be extended appropriately and the Subcontract Sum shall be increased in the amount of the Subcontractor's reasonable additional costs of demobilization, delay, and remobilization, which adjustments shall be accomplished as provided in Article 5 of this Agreement.

§ 4.4.4 To the fullest extent permitted by law, the Contractor shall indemnify and hold harmless the Subcontractor, the Subcontractor's Sub-subcontractors, and agents and employees of any of them from and against claims, damages, losses, and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area if in fact the material or substance presents the risk of bodily injury or death as described in Section 4.4.3 and has not been rendered harmless, provided that such claim, damage, loss, or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) except to the extent that such damage, loss, or expense is due to the fault or negligence of the party seeking indemnity.

§ 4.4.5 The Subcontractor shall reimburse the Contractor for the cost and expense the Contractor incurs (1) for remediation of a hazardous material or substance brought to the site and negligently handled by the Subcontractor or (2) where the Subcontractor fails to perform its obligations under Section 4.4.3, except to the extent that the cost and expense are due to the Contractor's fault or negligence.

### § 4.5 Cleaning Up
§ 4.5.1 The Subcontractor shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations performed under this Subcontract. The Subcontractor shall not be held responsible for conditions caused by other contractors or subcontractors.

§ 4.5.2 As provided under Section 3.4.2, if the Subcontractor fails to clean up as provided in the Subcontract Documents, the Contractor may charge the Subcontractor for the Subcontractor's appropriate share of cleanup costs.

### § 4.6 Warranty
§ 4.6.1 The Subcontractor warrants to the Owner, Architect, and Contractor that materials and equipment furnished under this Subcontract will be of good quality and new unless the Subcontract Documents require or permit otherwise. The Subcontractor further warrants that the Work will conform to the requirements of the Subcontract Documents and will be free from defects, except for those inherent in the quality of the Work the Subcontract Documents require or permit. Work, materials, or equipment not conforming to these requirements may be considered defective. The Subcontractor's warranty excludes remedy for damage or defect caused by abuse, alterations to the Work not executed by the Subcontractor, improper or insufficient maintenance, improper operation, or normal wear and tear under normal usage. If required by the Architect and Contractor, the Subcontractor shall provide satisfactory evidence as to the kind and quality of materials and equipment furnished or to be furnished.

§ 4.6.2 All material, equipment, or other special warranties required by the Subcontract Documents shall be issued in the name of the Owner, or shall be transferable to the Owner, and shall commence in accordance with the Subcontract Documents.

### § 4.7 Indemnification
§ 4.7.1 To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Owner, Contractor, Architect, Architect's consultants, and agents and employees of any of them from and against claims, damages, losses, and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the Subcontractor's Work under this Subcontract, provided that any such claim, damage, loss, or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the negligent acts or omissions of the Subcontractor, the Subcontractor's Sub-subcontractors, anyone directly or indirectly employed by them, or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss, or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or otherwise reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section 4.7.

**Init.**

**/**

AIA Document A401™ – 2017. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:51:43 ET on 11/12/2018 under Order No.7097645598 which expires on 09/03/2019, and is not for resale.
**User Notes:**                                                                                                    (1112044858)

**7**

**§ 4.7.2** In claims against any person or entity indemnified under this Section 4.7 by an employee of the Subcontractor, the Subcontractor's Sub-subcontractors, anyone directly or indirectly employed by them, or anyone for whose acts they may be liable, the indemnification obligation under Section 4.7.1 shall not be limited by a limitation on the amount or type of damages, compensation or benefits payable by or for the Subcontractor, or the Subcontractor's Sub-subcontractors under workers' compensation acts, disability benefit acts, or other employee benefit acts.

**§ 4.8 Remedies for Nonpayment**
If the Contractor does not pay the Subcontractor through no fault of the Subcontractor, within seven days from the time payment should be made as provided in this Agreement, the Subcontractor may, without prejudice to any other available remedies, upon seven additional days' notice to the Contractor, stop the Work of this Subcontract until payment of the amount owing has been received. The Subcontract Sum shall, by appropriate Modification, be increased by the amount of the Subcontractor's reasonable costs of demobilization, delay, and remobilization.

**§ 4.9 Professional Services Provided by Subcontractor**
**§ 4.9.1** The Subcontractor shall not be required to provide professional services that constitute the practice of architecture or engineering unless such services are specifically required by the Subcontract Documents or unless the Subcontractor is required to provide such services in order to carry out the Subcontractor's responsibilities for its own construction means, methods, techniques, sequences, and procedures. The Subcontractor shall not be required to provide professional services in violation of applicable law.

**§ 4.9.2** If professional design services or certifications by a design professional related to systems, materials, or equipment are specifically required of the Subcontractor by the Subcontract Documents, the Contractor will provide all performance and design criteria that such services must satisfy to the extent the Contractor has received such performance and design criteria from the Owner and Architect under the terms of the Prime Contract.

**§ 4.9.3** If professional design services or certifications by a design professional are required because of means, methods, techniques, sequences, or procedures required by the Contractor and related to the Work of the Subcontractor, the Contractor will provide all performance and design criteria that such services must satisfy.

**§ 4.9.4** The Subcontractor shall be entitled to rely upon the adequacy, accuracy, and completeness of the performance and design criteria received from the Contractor under this Section 4.9.

**§ 4.9.5** The Subcontractor shall cause the professional services performed under this Section 4.9 to be provided by a properly licensed design professional, whose signature and seal shall appear on all drawings, calculations, specifications, certifications, Shop Drawings, and other submittals prepared by such professional. Shop drawings and other submittals related to the Work designed by such design professional shall bear the professional's written approval when submitted to the Contractor. The Contractor shall be entitled to rely upon the adequacy, accuracy, and completeness of the services, certifications, and approvals performed or provided by the design professionals, provided the Contractor has provided to the Subcontractor all performance and design criteria required by this Section 4.9.

**ARTICLE 5   CHANGES IN THE WORK**
**§ 5.1** The Owner may make changes in the Work by issuing Modifications to the Prime Contract. Upon receipt of a Modification to the Prime Contract issued subsequent to the execution of this Agreement, the Contractor shall promptly notify the Subcontractor of such Modification. Unless otherwise directed by the Contractor, the Subcontractor shall not thereafter order materials or perform Work that would be inconsistent with the changes made by the Modification to the Prime Contract.

**§ 5.2** The Subcontractor may be ordered in writing by the Contractor, without invalidating this Subcontract, to make changes in the Work within the general scope of this Subcontract consisting of additions, deletions, or other revisions, including those required by Modifications to the Prime Contract issued subsequent to the execution of this Agreement, with the Subcontract Sum and the Subcontract Time adjusted accordingly. The Subcontractor, prior to the commencement of such changed or revised Work, shall submit promptly to the Contractor written copies of a Claim for adjustment to the Subcontract Sum and Subcontract Time for such revised Work in a manner consistent with requirements of the Subcontract Documents.

**AIA Document A401™ – 2017.** Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:51:43 ET on 11/12/2018 under Order No.7097645598 which expires on 09/03/2019, and is not for resale.
User Notes: (1112044856)

Init.
/

8

§ 5.3 The Subcontractor shall make all Claims promptly to the Contractor for additional cost, extensions of time and damages for delays, or other causes in accordance with the Subcontract Documents. A Claim which will affect or become part of a Claim which the Contractor is required to make under the Prime Contract within a specified time period or in a specified manner shall be made in sufficient time to permit the Contractor to satisfy the requirements of the Prime Contract. Such Claims shall be received by the Contractor not less than two working days preceding the time by which the Contractor's Claim must be made. Failure of the Subcontractor to make such a timely Claim shall bind the Subcontractor to the same consequences as those to which the Contractor is bound.

## ARTICLE 6   CLAIMS AND DISPUTES
### § 6.1 Mediation
§ 6.1.1 Claims, disputes, or other matters in controversy arising out of or related to this Subcontract, except those waived as provided for in Sections 6.4 and 11.3.2, shall be subject to mediation as a condition precedent to binding dispute resolution.

§ 6.1.2 The parties shall endeavor to resolve their Claims by mediation which, unless the parties mutually agree otherwise, shall be administered by the American Arbitration Association in accordance with its Construction Industry Mediation Procedures in effect on the date of the Agreement. A request for mediation shall be made in writing, delivered to the other party to this Subcontract and filed with the person or entity administering the mediation. The request may be made concurrently with the filing of binding dispute resolution proceedings but, in such event, mediation shall proceed in advance of binding dispute resolution proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order. If an arbitration is stayed pursuant to this Section 6.1.2, the parties may nonetheless proceed to the selection of the arbitrators(s) and agree upon a schedule for later proceedings.

§ 6.1.3 The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

### § 6.2 Binding Dispute Resolution
For any Claim subject to, but not resolved by mediation pursuant to Section 6.1, the method of binding dispute resolution shall be as follows:
*(Check the appropriate box.)*

[ X ]   Arbitration pursuant to Section 6.3 of this Agreement

[   ]   Litigation in a court of competent jurisdiction

[   ]   Other: *(Specify)*

If the Contractor and Subcontractor do not select a method of binding dispute resolution, or do not subsequently agree in writing to a binding dispute resolution method other than litigation, Claims will be resolved by litigation in a court of competent jurisdiction.

### § 6.3 Arbitration
§ 6.3.1 If the Contractor and Subcontractor have selected arbitration as the method of binding dispute resolution in Section 6.2, any Claim subject to, but not resolved by, mediation shall be subject to arbitration which, unless the parties mutually agree otherwise, shall be administered by the American Arbitration Association in accordance with its Construction Industry Arbitration Rules in effect on the date of this Agreement. The arbitration should be conducted in the place where the Project is located, unless another location is mutually agreed upon. A demand for arbitration shall be made in writing, delivered to the other party to the Subcontract, and filed with the person or entity administering the arbitration. The party filing a notice of demand for arbitration must assert in the demand all Claims then known to that party on which arbitration is permitted to be demanded.

§ 6.3.2 A demand for arbitration shall be made no earlier than concurrently with the filing of a request for mediation but in no event shall it be made after the date when the institution of legal or equitable proceedings based on the Claim

**Init.**

**/**

AIA Document A401™ – 2017. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:51:43 ET on 11/12/2018 under Order No.7097645598 which expires on 08/03/2019, and is not for resale.
User Notes:                                                                                                                                (1112044856)

**9**

would be barred by the applicable statute of limitations. For statute of limitations purposes, receipt of a written demand for arbitration by the person or entity administering the arbitration shall constitute the institution of legal or equitable proceedings based on the Claim.

§ 6.3.3 The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

§ 6.3.4 The foregoing agreement to arbitrate, and other agreements to arbitrate with an additional person or entity consented to by parties to the Agreement, shall be specifically enforceable under applicable law in any court having jurisdiction thereof.

**§ 6.3.5 Consolidation or Joinder**
§ 6.3.5.1 Subject to the rules of the American Arbitration Association or other applicable arbitration rules, either party may consolidate an arbitration conducted under this Agreement with any other arbitration to which it is a party provided that (1) the arbitration agreement governing the other arbitration permits consolidation; (2) the arbitrations to be consolidated substantially involve common questions of law or fact; and (3) the arbitrations employ materially similar procedural rules and methods for selecting arbitrator(s).

§ 6.3.5.2 Subject to the rules of the American Arbitration Association or other applicable arbitration rules, either party may include by joinder persons or entities substantially involved in a common question of law or fact whose presence is required if complete relief is to be accorded in arbitration, provided that the party sought to be joined consents in writing to such joinder. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of a Claim, dispute, or other matter in question not described in the written consent.

§ 6.3.5.3 The Contractor and Subcontractor grant to any person or entity made a party to an arbitration conducted under this Section 6.3, whether by joinder or consolidation, the same rights of joinder and consolidation as the Contractor and Subcontractor under this Agreement.

**§ 6.4 Waiver of Claims for Consequential Damages**
The Contractor and Subcontractor waive claims against each other for consequential damages arising out of or relating to this Subcontract, including without limitation, any consequential damages due to either party's termination in accordance with Article 7. Nothing contained herein shall be deemed to preclude an award of liquidated damages, when applicable, in accordance with the requirements of this Agreement.

**ARTICLE 7   TERMINATION, SUSPENSION OR ASSIGNMENT OF THE SUBCONTRACT**
**§ 7.1 Termination by the Subcontractor**
The Subcontractor may terminate the Subcontract for the same reasons and under the same circumstances and procedures with respect to the Contractor as the Contractor may terminate with respect to the Owner under the Prime Contract, or for nonpayment of amounts due under this Subcontract for 60 days or longer. In the event of such termination by the Subcontractor for any reason which is not the fault of the Subcontractor, the Subcontractor's Sub-subcontractors, or their agents or employees or other persons or entities performing portions of the Work under contract with the Subcontractor, the Subcontractor shall be entitled to recover from the Contractor payment for Work executed and for proven loss with respect to materials, equipment, tools, and construction equipment and machinery, as well as reasonable overhead and profit on work not executed and costs incurred by reason of such termination.

**§ 7.2 Termination by the Contractor**
**§ 7.2.1 Termination for Cause**
If the Subcontractor repeatedly fails or neglects to carry out the Work in accordance with the Subcontract Documents or otherwise to perform in accordance with this Subcontract and fails within a ten-day period after receipt of notice to commence and continue correction of such default or neglect with diligence and promptness, the Contractor may, by notice to the Subcontractor and without prejudice to any other remedy the Contractor may have, terminate the Subcontract and finish the Subcontractor's Work by whatever method the Contractor may deem expedient. If the unpaid balance of the Subcontract Sum exceeds the expense of finishing the Subcontractor's Work and other damages incurred by the Contractor and not expressly waived, such excess shall be paid to the Subcontractor. If such expense and damages exceed the unpaid balance of the Subcontract Sum, the Subcontractor shall pay the difference to the Contractor.

**Init.**

**/**

AIA Document A401™ – 2017. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:51:43 ET on 11/12/2018 under Order No.7097645598 which expires on 09/03/2019, and is not for resale.
User Notes:                                                                                           (1112044856)

**10**

### § 7.2.2 Termination for Convenience

**§ 7.2.2.1** If the Owner terminates the Prime Contract for the Owner's convenience, the Contractor shall promptly deliver notice to the Subcontractor.

**§ 7.2.2.2** In case of such termination for the Owner's convenience, the Subcontractor shall be entitled to receive payment for Work properly executed, costs incurred by reason of the termination, and reasonable overhead and profit on the Work not executed.

**§ 7.2.2.3** Upon receipt of notice of termination, the Subcontractor shall
 .1 cease operations as directed by the Contractor in the notice;
 .2 take actions necessary, or that the Contractor may direct, for the protection and preservation of the Work; and
 .3 except for Work directed to be performed prior to the effective date of termination stated in the notice, terminate all existing Sub-subcontracts and purchase orders and enter into no further Sub-subcontracts and purchase orders.

### § 7.3 Suspension by the Contractor for Convenience

**§ 7.3.1** The Contractor may, without cause, order the Subcontractor in writing to suspend, delay, or interrupt the Work of this Subcontract in whole or in part for such period of time as the Contractor may determine. In the event of suspension ordered by the Contractor, the Subcontractor shall be entitled to an equitable adjustment of the Subcontract Time and Subcontract Sum.

**§ 7.3.2** The Subcontract Time and Subcontract Sum shall be adjusted for increases in the cost and time caused by suspension, delay or interruption as described in Section 7.3.1. Adjustment of the Subcontract Sum shall include profit on the increased cost of performance caused by suspension, delay, or interruption. No adjustment shall be made to the extent that
 .1 performance is, was or would have been so suspended, delayed, or interrupted by another cause for which the Subcontractor is responsible; or
 .2 an equitable adjustment is made or denied under another provision of this Subcontract.

### § 7.4 Assignment of the Subcontract

**§ 7.4.1** In the event the Owner terminates the Prime Contract for cause, this Subcontract is assigned to the Owner pursuant to Section 5.4 of AIA Document A201–2017 provided the Owner accepts the assignment by notifying the Contractor and Subcontractor.

**§ 7.4.2** Without the Contractor's written consent, the Subcontractor shall not assign the Work of this Subcontract, subcontract the whole of this Subcontract, or subcontract portions of this Subcontract.

### ARTICLE 8   THE WORK OF THIS SUBCONTRACT

The Subcontractor shall execute the following portion of the Work described in the Subcontract Documents, including all labor, materials, equipment, services and other items required to complete such portion of the Work, except to the extent specifically indicated in the Subcontract Documents to be the responsibility of others.
*(Insert a precise description of the Work of this Subcontract, referring where appropriate to numbers of Drawings, sections of Specifications and pages of Addenda, Modifications, and accepted alternates.)*

Complete framing of all buildings as shown on plans. Includes maintenance, clubhouse and all garages. General contractor to furnish all materials.

### ARTICLE 9   DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

**§ 9.1** The date of commencement of the Subcontractor's Work, shall be:
*(Check one of the following boxes.)*

 [   ] The date of this Agreement.

 [ X  ] A date set forth in a notice to proceed issued by the Contractor.

 [   ] Established as follows:

**Init.**

**/**

**AIA Document A401™ – 2017.** Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:51:43 ET on 11/12/2018 under Order No.7097645598 which expires on 09/03/2019, and is not for resale.
User Notes: (1112044856)

**11**

*(Insert a date or a means to determine the date of commencement of the Subcontractor's Work.)*

If a date of commencement of the Subcontractor's Work is not selected, then the date of commencement shall be the date of this Agreement.

**§ 9.2 Subcontract Time**
**§ 9.2.1** The Subcontract Time is the period of time, including authorized adjustments, allotted in the Subcontract Documents for Substantial Completion of the Work described in the Subcontract Documents. The Subcontract Time shall be measured from the date of commencement of the Subcontractor's Work.

**§ 9.2.2** Subject to adjustments of the Subcontract Time as provided in the Subcontract Documents, the Subcontractor shall achieve substantial completion of the Subcontractor's Work:
*(Check one of the following boxes and complete the necessary information.)*

     [ X ]    Not later than one hundred one hundred eighty  ( 180  ) calendar days from the date of commencement of the Subcontractor's Work.

     [   ]    By the following date:

**§ 9.2.3** Subject to adjustments of the Subcontract Time as provided in the Subcontract Documents, if portions of the Subcontractor's Work are to be completed prior to substantial completion of the Subcontractor's Work, then the Subcontractor shall achieve earlier substantial completion of such portions by the following dates.
*(List all portions of the Subcontractor's Work required to achieve substantial completion of the Subcontractor's Portion of the Work.)*

**Portion of Work**          **Substantial Completion**

**§ 9.2.4** If the Subcontractor fails to achieve substantial completion as provided in this Section 9.2, liquidated damages, if any, shall be assessed as set forth in Section 3.4.

**§ 9.3** With respect to the obligations of both the Contractor and the Subcontractor, time is of the essence of this Subcontract.

**§ 9.4** No extension of time will be valid without the Contractor's written consent after a Claim is made by the Subcontractor in accordance with Section 5.3.

**ARTICLE 10   SUBCONTRACT SUM**
**§ 10.1** The Contractor shall pay the Subcontractor the Subcontract Sum in current funds for the Subcontractor's performance of the Subcontract. The Subcontract Sum shall be two million fifty thousand dollars  ($ 2,050,000  ), subject to additions and deductions as provided in the Subcontract Documents.

**§ 10.2 Alternates**
**§ 10.2.1** Alternates, if any, included in the Subcontract Sum:

**Item**          **Price**

**§ 10.2.2** Subject to the conditions noted below, the following alternates may be accepted by the Contractor following execution of this Agreement. Upon acceptance, the Contractor shall issue a Modification to this Subcontract:
*(Insert below each alternate and the conditions that must be met for the Contractor to accept the alternate.)*

**Item**          **Price**          **Conditions for Acceptance**

**Init.**

**/**

AIA Document A401™ – 2017. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:51:43 ET on 11/12/2018 under Order No.7097645598 which expires on 09/03/2019, and is not for resale.
User Notes:          (1112044856)

**12**

§ 10.3 Unit prices, if any:
*(Identify and state the unit price, and quantity limitations, if any, to which the unit price will be applicable.)*

| Item | Units and Limitations | Price Per Unit ($0.00) |
|------|----------------------|------------------------|

§ 10.4 Allowances, if any, included in the Subcontract Sum:
*(Identify allowance and state exclusions, if any, from the allowance price.)*

| Item | Price |
|------|-------|

## ARTICLE 11   PAYMENTS
### § 11.1 Progress Payments
§ 11.1.1 Based upon Applications for Payment submitted to the Contractor by the Subcontractor, corresponding to Applications for Payment submitted by the Contractor to the Architect, and Certificates for Payment issued by the Architect, the Contractor shall make progress payments on account of the Subcontract Sum to the Subcontractor as provided below and elsewhere in the Subcontract Documents. Unless the Contractor provides the Owner with a payment bond in the full penal sum of the Contract Sum, payments received by the Contractor and Subcontractor for Work properly performed by their contractors and suppliers shall be held by the Contractor and Subcontractor for those contractors or suppliers who performed Work or furnished materials, or both, under contract with the Contractor or Subcontractor for which payment was made to the Contractor by the Owner or to the Subcontractor by the Contractor, as applicable. Nothing contained herein shall require money to be placed in a separate account and not commingled with money of the Contractor or Subcontractor, shall create any fiduciary liability or tort liability on the part of the Contractor or Subcontractor for breach of trust, or shall entitle any person or entity to an award of punitive damages against the Contractor or Subcontractor for breach of the requirements of this provision.

§ 11.1.2 The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

§ 11.1.3 Provided an Application for Payment is received by the Contractor not later than the   day of a month, the Contractor shall include the Subcontractor's Work covered by that application in the next Application for Payment which the Contractor is entitled to submit to the Architect. The Contractor shall pay the Subcontractor each progress payment no later than seven working days after the Contractor receives payment from the Owner. If the Architect does not issue a Certificate for Payment or the Contractor does not receive payment for any cause which is not the fault of the Subcontractor, the Contractor shall pay the Subcontractor, on demand, a progress payment computed as provided in Sections 11.1.7, 11.1.8, 11.1.9 and 11.2.

§ 11.1.4 If the Subcontractor's Application for Payment is received by the Contractor after the application date fixed above, the Subcontractor's Work covered by it shall be included by the Contractor in the next Application for Payment submitted to the Architect.

§ 11.1.5 The Subcontractor shall submit to the Contractor a schedule of values prior to submitting the Subcontractor's first Application for Payment. Each subsequent Application for Payment shall be based upon the most recent schedule of values submitted by the Subcontractor in accordance with the Subcontract Documents. The schedule of values shall allocate the entire Subcontract Sum among the various portions of the Subcontractor's Work and be prepared in such form and supported by such data to substantiate its accuracy as the Contractor may require, and unless objected to by the Contractor,  shall be used as a basis for reviewing the Subcontractor's Applications for Payment.

§ 11.1.6 Applications for Payment submitted by the Subcontractor shall indicate the percentage of completion of each portion of the Subcontractor's Work as of the end of the period covered by the Application for Payment.

§ 11.1.7 Subject to the provisions of the Subcontract Documents, the amount of each progress payment shall be computed as follows:

**Init.**

**/**

AIA Document A401™ – 2017. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:51:43 ET on 11/12/2018 under Order No.7097645598 which expires on 09/03/2019, and is not for resale.
User Notes:                                                                                         (1112044856)

**13**

**§ 11.1.7.1** The amount of each progress payment shall first include:

 .1  That portion of the Subcontract Sum properly allocable to completed Work;

 .2  That portion of the Subcontract Sum properly allocable to materials and equipment delivered and suitably stored at the site by the Subcontractor for subsequent incorporation in the Subcontractor's Work or, if approved by the Contractor, suitably stored off the site at a location agreed upon in writing; and

 .3  The amount, if any, for changes in the Work that are not in dispute and have been properly authorized by the Contractor, to the same extent provided in the Prime Contract, pending a final determination by the Contractor of the cost of changes in the Subcontractor's Work, even though the Subcontract Sum has not yet been adjusted.

**§ 11.1.7.2** The amount of each progress payment shall then be reduced by:

 .1  The aggregate of previous payments made by the Contractor;

 .2  The amount, if any, for Work that remains uncorrected and for which the Contractor has previously withheld a Certificate for Payment as provided in Article 9 of AIA Document A201-2017 for a cause that is the fault of the Subcontractor;

 .3  For Work performed or defects discovered since the last payment application, any amount for which the Contractor may withhold payment in whole or in part, as provided in Article 9 of AIA Document A201-2017, for a cause that is the fault of the Subcontractor; and

 .4  Retainage withheld pursuant to Section 11.1.8 of this Agreement.

### § 11.1.8 Retainage

**§ 11.1.8.1** For each progress payment made prior to substantial completion of the Subcontractor's Work, the Contractor may withhold the following amounts as retainage from the payment otherwise due:
*(Insert a percentage or amount to be withheld as retainage from each Application for Payment. The amount of retainage may be limited by governing law.)*

 10% retainage held all draws

**§ 11.1.8.1.1** The following items are not subject to retainage:
*(Insert any items not subject to the withholding of retainage, such as general conditions, insurance, etc.)*

**§ 11.1.8.2** Reduction or limitation of retainage, if any, shall be as follows:
*(If the retainage established in Section 11.1.8.1 is to be modified prior to substantial completion of the entire Work, including modifications for substantial completion of portions of the Subcontractor's Work as provided in Section 9.2.3, insert provisions for such modification.)*

**§ 11.1.9** Upon the partial or entire disapproval by the Contractor of the Subcontractor's Application for Payment, the Contractor shall provide notice to the Subcontractor. If the Subcontractor disputes the Contractor's decision regarding a Subcontractor's Application for Payment in whole or in part, the Subcontractor may submit a Claim in accordance with Article 6. When the basis for the disapproval has been remedied, the Subcontractor shall be paid the amounts withheld.

**§ 11.1.10** Provided the Contractor has fulfilled its payment obligations under the Subcontract Documents, the Subcontractor shall defend and indemnify the Contractor and Owner from all loss, liability, damage, or expense, including reasonable attorney's fees and litigation expenses, arising out of any lien claim or other claim for payment by any of the Subcontractor's subcontractors, suppliers, or vendors of any tier. Upon receipt of notice of such lien claim or other claim for payment, the Contractor shall notify the Subcontractor. If approved by the applicable court, when required, the Subcontractor may substitute a surety bond for the property against which the lien or other claim for payment has been asserted.

**Init.**

**/**

AIA Document A401™ – 2017. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:51:43 ET on 11/12/2018 under Order No.7097645598 which expires on 09/03/2019, and is not for resale.
User Notes:               (1112044856)

**14**

### § 11.2 Substantial Completion

When the Subcontractor's Work or a designated portion thereof is substantially complete and in accordance with the requirements of the Prime Contract, the Contractor shall, upon application by the Subcontractor, make prompt Application for Payment for such Work. Within 30 days following issuance by the Architect of the Certificate for Payment covering such substantially completed Work, the Contractor shall, to the full extent allowed in the Prime Contract, make payment to the Subcontractor, deducting any portion of the funds for the Subcontractor's Work withheld in accordance with the certificate to cover costs of items to be completed or corrected by the Subcontractor. Such payment to the Subcontractor shall be the entire unpaid balance of the Subcontract Sum if a full release of retainage is allowed under the Prime Contract for the Subcontractor's Work prior to the completion of the entire Project. If the Prime Contract does not allow for a full release of retainage, then such payment shall be an amount which, when added to previous payments to the Subcontractor, will reduce the retainage on the Subcontractor's substantially completed Work to the same percentage of retainage as that on the Contractor's Work covered by the certificate.

### § 11.3 Final Payment

§ 11.3.1 Final payment, constituting the entire unpaid balance of the Subcontract Sum, shall be made by the Contractor to the Subcontractor when the Subcontractor's Work is fully performed in accordance with the requirements of the Subcontract Documents, the Architect has issued a Certificate for Payment covering the Subcontractor's completed Work and the Contractor has received payment from the Owner. If, for any cause which is not the fault of the Subcontractor, a Certificate for Payment is not issued or the Contractor does not receive timely payment or does not pay the Subcontractor within seven days after receipt of payment from the Owner, final payment to the Subcontractor shall be made upon demand.

*(Insert provisions for earlier final payment to the Subcontractor, if applicable.)*

Final draw for retainage submitted 30 days after submittal of final draw.

§ 11.3.2 Before issuance of the final payment, the Subcontractor, if required, shall submit evidence satisfactory to the Contractor that all payrolls, bills for materials and equipment, and all known indebtedness connected with the Subcontractor's Work have been satisfied. Acceptance of final payment by the Subcontractor shall constitute a waiver of claims by the Subcontractor, except those previously made in writing and identified by the Subcontractor as unsettled at the time of final Application for Payment.

### § 11.4 Interest

Payments due and unpaid under this Subcontract shall bear interest from the date payment is due at such rate as the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.

*(Insert rate of interest agreed upon, if any.)*

% Applicable

## ARTICLE 12   INSURANCE AND BONDS

### § 12.1 Subcontractor's Required Insurance Coverage

§ 12.1.1 The Subcontractor shall purchase and maintain the following types and limits of insurance, from a company or companies lawfully authorized to issue insurance in the jurisdiction where the Project is located, as will protect the Subcontractor from claims that may arise out of, or result from, the Subcontractor's operations and completed operations under the Subcontract:

*(Specify each type of insurance, such as commercial general liability, automobile, worker's compensation, employers' liability, professional liability, and pollution, required to be carried by the Subcontractor, the limits of coverage for each type of insurance, and any other pertinent requirements.)*

| Type of Insurance | Limits | Other Pertinent Requirements |
|---|---|---|
| General Liability | $2,000,000/$1,000,000 | General Contractor as additional |
| Workers Comp | $1,000,000 | Insured |

§ 12.1.2 Coverages, whether written on an occurrence or claims-made basis, shall be maintained without interruption from the date of commencement of the Subcontractor's Work until the date of final payment and termination of any coverage required to be maintained after final payment to the Subcontractor, and, with respect to the Subcontractor's

**Init.**

**/**

AIA Document A401™ – 2017. Copyright © 1915, 1925, 1937, 1951, 1956, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:51:43 ET on 11/12/2018 under Order No.7097645598 which expires on 09/03/2019, and is not for resale.
User Notes: (1112044656)

**15**

completed operations coverage, until the expiration of the period for correction of Work or for such other period for maintenance of completed operations coverage as specified in the Prime Contract.

§ 12.1.3 If professional services are required under Section 4.9, the Subcontractor shall provide the professional liability insurance coverage required under this Section 12.1 for the following period after completion of the Work:

§ 12.1.4 Certificates of Insurance. The Subcontractor shall provide certificates of insurance acceptable to the Contractor evidencing compliance with the requirements in this Article 12 at the following times: (1) prior to commencement of the Subcontractor's Work; (2) upon renewal or replacement of each required policy of insurance; and (3) upon the Contractor's written request. An additional certificate evidencing continuation of liability coverage, including coverage for completed operations, shall be submitted with the final Application for Payment and thereafter upon renewal or replacement of such coverage until the expiration of the time required in this Article 12. The certificates shall show the Contractor and the Owner as additional insureds on the Subcontractor's Commercial General Liability and any excess or umbrella liability policy.

§ 12.1.5 Deductibles and Self-Insured Retentions. The Subcontractor shall disclose to the Contractor any deductible or self-insured retentions applicable to any insurance required to be provided by the Subcontractor.

§ 12.1.6 Additional Insured Obligations. To the fullest extent permitted by law, the Subcontractor shall cause its commercial general liability coverage to include: (1) the Contractor, the Owner, the Architect, and the Architect's consultants as additional insureds for claims caused in whole or in part by the Subcontractor's negligent acts or omissions during the Subcontractor's operations; and (2) the Contractor and Owner as additional insureds for claims caused in whole or in part by the Subcontractor's negligent acts or omissions for which loss occurs during the Subcontractor's completed operations. The additional insured coverage shall be primary and non-contributory to any of the Contractor's and Owner's general liability insurance policies and shall apply to both ongoing and completed operations. To the extent commercially available, the additional insured coverage shall be no less than that provided by Insurance Services Office, Inc. (ISO) CG 20 10 07 04, CG 20 37 07 04, and, with respect to the Architect and the Architect's consultants, CG 20 32 07 04.

§ 12.1.7 Notice of Cancellation or Change in Coverage. Within three (3) business days of the date the Subcontractor becomes aware of an impending or actual cancellation or expiration of any insurance required by the Subcontract Documents, the Subcontractor shall provide notice to the Contractor of such impending or actual cancellation or expiration. Upon receipt of notice from the Subcontractor, the Contractor shall, unless the lapse in coverage arises from an act or omission of the Contractor, have the right to suspend the Work in accordance with this Agreement until the lapse in coverage has been cured by the procurement of replacement coverage by the Subcontractor. The furnishing of notice by the Subcontractor shall not relieve the Subcontractor of any contractual obligation to provide any required coverage.

§ 12.2 Subcontractor's Required Performance Bond and Payment Bond
§ 12.2.1 The Subcontractor shall provide surety bonds, from a company or companies lawfully authorized to issue surety bonds in the jurisdiction where the Project is located, as follows:
*(Specify type and penal sum of bonds.)*

| Type | Penal Sum ($0.00) |
|------|------|
| Payment Bond | |
| Performance Bond  N/A | |

Payment and Performance Bonds shall be AIA Document A312™, Payment Bond and Performance Bond, or contain provisions identical to AIA Document A312™, current as of the date of this Agreement.

§ 12.2.2 Upon the request of any person or entity appearing to be a potential beneficiary of bonds covering payment of obligations under this Agreement, the Subcontractor shall promptly furnish a copy of the bonds or shall permit a copy to be made.

Init.

/

AIA Document A401™ – 2017. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:51:43 ET on 11/12/2018 under Order No.7097645598 which expires on 09/03/2019, and is not for resale.
User Notes:                                                                                                  (1112044858)

16

**§ 12.3 Contractor's Insurance and Bond Obligations**
§ 12.3.1 The Contractor shall furnish to the Subcontractor certificates of insurance evidencing insurance coverage required of the Contractor under the Prime Contract.

§ 12.3.2 The Contractor shall promptly, upon request of the Subcontractor, furnish a copy or permit a copy to be made of any bond covering payment of obligations arising under the Subcontract.

**§ 12.4 Property Insurance**
§ 12.4.1 When requested in writing, the Contractor shall provide the Subcontractor with copies of the property and equipment policies in effect for the Project, to the extent copies of the policies are available to the Contractor. The Contractor shall notify the Subcontractor if the required property insurance policies are not in effect.

§ 12.4.2 If the required property insurance is not in effect for the full value of the Subcontractor's Work, then the Subcontractor shall purchase insurance for the value of the Subcontractor's Work, and the Subcontractor shall be reimbursed for the cost of the insurance by an adjustment in the Subcontract Sum.

§ 12.4.3 Property insurance for the Subcontractor's materials and equipment required for the Subcontractor's Work, stored off site or in transit and not covered by the Project property insurance, shall be paid for through the Application for Payment process.

**§ 12.5 Waivers of Subrogation**
The Contractor and Subcontractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents, and employees, each of the other, and (2) the Owner, the Architect, the Architect's consultants, and (3) Separate Contractors, if any, and any of their subcontractors, sub-subcontractors, agents, and employees for damages caused by fire or other causes of loss to the extent those losses are covered by property insurance provided under the Prime Contract or other property insurance applicable to the Work or to property at or adjacent to the Project site, except such rights as they may have to proceeds of such insurance held by the Owner as a fiduciary. The Subcontractor shall require similar written waivers in favor of the individuals and entities enumerated herein from the Subcontractor's Sub-subcontractors, agents, and employees. The policies of insurance purchased and maintained by each person or entity agreeing to waive claims pursuant to this Section 12.5 shall not prohibit this waiver of subrogation, which shall be effective as to a person or entity (1) even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, (2) even though that person or entity did not pay the insurance premium directly or indirectly, or (3) whether or not the person or entity had an insurable interest in the property damaged.

**ARTICLE 13   TEMPORARY FACILITIES, SERVICES, EQUIPMENT AND WORKING CONDITIONS**
§ 13.1 The Contractor shall furnish and make the Contractor's temporary facilities and services available to the Subcontractor at no cost, except as noted below:

§ 13.2 The Contractor's equipment will be available to the Subcontractor only at the Contractor's discretion and on mutually satisfactory terms, except as noted below:

§ 13.3 Specific working conditions as noted below:
*(Insert any specific arrangements or requirements concerning working conditions and labor matters applicable to the Subcontractor's Work.)*

**ARTICLE 14   MISCELLANEOUS PROVISIONS**
§ 14.1 Where reference is made in this Subcontract to a provision of another Subcontract Document, the reference refers to that provision as amended or supplemented by other provisions of the Subcontract Documents.

§ 14.2 The Contractor's representative:

**Init.**

**/**

AIA Document A401™ – 2017. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:51:43 ET on 11/12/2018 under Order No.7097645598 which expires on 09/03/2019, and is not for resale.
User Notes:                                                                                                (1112044856)

**17**

*(Name, address, email address and other information)*

Roger Zais
4851 Keller Springs Road #209
Addison, Tx 75001
817-233-4036

**§ 14.3** The Subcontractor's representative:
*(Name, address, email address and other information)*

Ike Chukwura
2720 Explorador
Grand Prairie, Tx
214-363-1313

Patrick Oduah 214-445-8509

**§ 14.4 Notice**
**§ 14.4.1** Except as otherwise provided in Section 14.4.2, where the Subcontract Documents require one party to notify or give notice to the other party, such notice shall be provided in writing to the designated representative of the party to whom the notice is addressed and shall be deemed to have been duly served if delivered in person, by mail, by courier, or by electronic transmission if a method for electronic notice is set forth in Section 14.4.3.

**§ 14.4.2** Notice of Claims shall be provided in writing and shall be deemed to have been duly served only if delivered to the designated representative of the party to whom the notice is addressed by certified or registered mail, or by courier providing proof of delivery.

**§ 14.4.3** Notice in electronic format, pursuant to Section 14.4.1, may be given in accordance with AIA Document E203™–2013, Building Information Modeling and Digital Data Exhibit, if completed, or as otherwise set forth below:
*(If other than in accordance with AIA Document E203™–2013, insert requirements for delivering notice in electronic format such as name, title, and email address of the recipient and whether and how the system will be required to generate a read receipt for the transmission.)*

**§ 14.5** Neither the Contractor's nor the Subcontractor's representative shall be changed without ten days' prior notice to the other party.

**§ 14.6** The invalidity of any provision of the Subcontract Documents shall not invalidate the Subcontract or its remaining provisions. If it is determined that any provision of the Subcontract Documents violates any law or is otherwise invalid or unenforceable, then that provision shall be revised to the extent necessary to make that provision legal and enforceable. In such case, the Subcontract shall be construed, to the fullest extent permitted by law, to give effect to the parties' intentions and purposes in executing the Subcontract.

**§ 14.7** The parties shall agree upon protocols governing the transmission and use of Instruments of Service or any other information or documentation in digital form. The parties will use AIA Document E203™–2013, Building

**Init.**

**/**

**AIA Document A401™ – 2017.** Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:51:43 ET on 11/12/2018 under Order No.7097645598 which expires on 09/03/2019, and is not for resale.
**User Notes:**                                                                                              (1112044856)

**18**

Information Modeling and Digital Data Exhibit, to establish the protocols for the development, use, transmission, and exchange of digital data.

§ 14.7.1 Any use of, or reliance on, all or a portion of a building information model without agreement to protocols governing the use of, and reliance on, the information contained in the model and without having those protocols set forth in AIA Document E203™–2013, Building Information Modeling and Digital Data Exhibit, and the requisite AIA Document G202™–2013, Project Building Information Modeling Protocol Form, shall be at the using or relying party's sole risk and without liability to the other party and its contractors or consultants, the authors of, or contributors to, the building information model, and each of their agents and employees.

### ARTICLE 15  ENUMERATION OF SUBCONTRACT DOCUMENTS
§ 15.1 This Agreement is comprised of the following documents:

    .1    AIA Document A401™–2017, Standard Form Agreement Between Contractor and Subcontractor;

    .2    Prime Agreement between the Owner and Contractor, including all exhibits thereto, attached as Exhibit A;

    .3    AIA Document E203™–2013, Building Information Modeling and Digital Data Exhibit, if not included in the Prime Agreement, dated as indicated below:
        *(Insert the date of the E203–2013 incorporated into this Agreement.)*

    .4    Other Exhibits incorporated into this Agreement:
        *(Clearly identify any other exhibits incorporated into this Agreement.)*

        CJ Group Proposal

    .5    Other documents:
        *(List other documents, if any, forming part of the Agreement.)*

        Ikemire Architects Drawings Revised 10-18
        BEI MEP revised 11-18
        Civil Point Engineers 10-17-17
        Geoscience Engineers
        Kunkel Engineers Structural revised 1-17
        Project Manual
        Project Spec Book

This Agreement entered into as of the day and year first written above.

11/19/2018

**CONTRACTOR** *(Signature)*               **SUBCONTRACTOR** *(Signature)*
Richard Shaw Manager                     Ike Chukwura Owner
*(Printed name and title)*                    *(Printed name and title)*

**Init.**

**/**

**AIA Document A401™ – 2017.** Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:51:43 ET on 11/12/2018 under Order No.7097645598 which expires on 08/03/2019, and is not for resale.
User Notes:                                    (1112044856)

**19**

## Additions and Deletions Report for
## AIA® Document A401™ – 2017

This Additions and Deletions Report, as defined on page 1 of the associated document, reproduces below all text the author has added to the standard form AIA document in order to complete it, as well as any text the author may have added to or deleted from the original AIA text. Added text is shown underlined. Deleted text is indicated with a horizontal line through the original AIA text.

Note:  This Additions and Deletions Report is provided for information purposes only and is not incorporated into or constitute any part of the associated AIA document. This Additions and Deletions Report and its associated document were generated simultaneously by AIA software at 13:51:43 ET on 11/12/2018.

PAGE 1

**AGREEMENT** made as of the 12  day of November  in the year 2018

...

*(Name, legal status, address and other information)*

North South Builder LLC
4851 Keller Springs Road #209
Addison, Tx 75001

...

CJ Group
2720 Explorador
Grand Prairie, Tx 75054

...

BSPV-PLANO
4851 Keller Springs Road #209
Addison, Tx 75001

...

Bridgemoor Plano
1100 Park Vista Road
Plano, Tx
PAGE 2

Ikemire Architexts
16660 North Dallas Parkway
Dallas, Tx

...

Complete framing of all buildings, clubhouse, maintenance and garage buildings.

Additions and Deletions Report for AIA Document A401™ – 2017. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:51:43 ET on 11/12/2018 under Order No.7097645598 which expires on 09/03/2018, and is not for resale.
User Notes:                                                                                                      (1112044856)

1

**PAGE 9**

[ X ]   Arbitration pursuant to Section 6.3 of this Agreement

**PAGE 11**

Complete framing of all buildings as shown on plans. Includes maintenance, clubhouse and all garages. General contractor to furnish all materials.

...

[ X ]   A date set forth in a notice to proceed issued by the Contractor.

**PAGE 12**

[ X ]   Not later than one hundred one hundred eighty   ( 180  ) calendar days from the date of commencement of the Subcontractor's Work.

...

§ 10.1 The Contractor shall pay the Subcontractor the Subcontract Sum in current funds for the Subcontractor's performance of the Subcontract. The Subcontract Sum shall be two million fifty thousand dollars   ($ 2,050,000   ), subject to additions and deductions as provided in the Subcontract Documents.

**PAGE 14**

10% retainage held all draws

**PAGE 15**

Final draw for retainage submitted 30 days after submittal of final draw.

...

% Applicable

...

General Liability          $2,000,000/$1,000,000    General Contractor as additional
Workers Comp               $1,000,000               Insured

**PAGE 16**

Performance Bond  N/A

**PAGE 18**

Roger Zais
4851 Keller Springs Road #209
Addison, Tx 75001
 817-233-4036

...

Ike Chukwura
2720 Explorador
Grand Prairie, Tx
214-363-1313

Patrick Oduah 214-445-8509

**PAGE 19**

Additions and Deletions Report for AIA Document A401™ – 2017. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:51:43 ET on 11/12/2018 under Order No.7097645596 which expires on 09/03/2019, and is not for resale.
User Notes:                                                                                                   (1112044656)

2

CJ Group Proposal

...

*(List other documents, if any, forming part of the Agreement.)*

Ikemire Architects Drawings Revised 10-18
BEI MEP revised 11-18
Civil Point Engineers 10-17-17
Geoscience Engineers
Kunkel Engineers Structural revised 1-17
Project Manual
Project Spec Book

...

Richard Shaw Manager                    Ike Chukwura Owner          11/19/2018

**Additions and Deletions Report for AIA Document A401™ – 2017.** Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:51:43 ET on 11/12/2018 under Order No.7097645598 which expires on 09/03/2019, and is not for resale.
**User Notes:**                                                                                 (1112044856)

3

## *Certification of Document's Authenticity*
*AIA® Document D401™ – 2003*

I,  , hereby certify, to the best of my knowledge, information and belief, that I created the attached final document simultaneously with its associated Additions and Deletions Report and this certification at 13:51:43 ET on 11/12/2018 under Order No. 7097645598 from AIA Contract Documents software and that in preparing the attached final document I made no changes to the original text of AIA® Document A401™ – 2017, Standard Form of Agreement Between Contractor and Subcontractor , as published by the AIA in its software, other than those additions and deletions shown in the associated Additions and Deletions Report.

_____
(Signed)

_____
(Title)

_____
(Dated)

AIA Document D401™ – 2003. Copyright © 1992 and 2003 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is
protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may
result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA
software at 13:51:43 ET on 11/12/2018 under Order No.7097645598 which expires on 09/03/2019, and is not for resale.
User Notes:                                                                                                  (1112044856)

1

# CJ Group

*OK*

November 1, 2018

Mr. Roger Zais

Bridgemoor Apartments

Plano, Texas

**Proposal for Framing the Bridgemoor, Plano Project**
We are pleased to provide the following proposal to furnish framing work for the above
Bridgemore project located at Park Vista, Plano, Texas:

**Scope includes:**
Framing of the buildings as shown on the drawings. The job will include framing, plywood, roof
trusses, roof decking, Tyvek or zip sheathing, installation of windows, furdowns and blocking.
Building will be ready for framing inspection, sheetrock and stucco.

The siding, fascia and sofit installation are included as part of the scope
CJ will only provide the labor, nails and equipment to perform the job.

| | |
|---|---|
| **Total Building Square Footage:** | **330,073** |
| **Total Proposal Amount:** | **$2,050,000.00** |

Thank you for the opportunity and let us know if you have questions or need additional
information.

Sincerely,

Ike J. Chukwura, President

# EXHIBIT B

### AFFIDAVIT FOR MECHANIC'S AND MATERIALMAN'S LIEN

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TARRANT | § |

BEFORE ME, the undersigned authority, a Notary Public in and for the State of Texas, on this day personally appeared Ike John Chukwura, who being by me here and now duly sworn, upon oath states:

1.      "My name is Ike John Chukwura and I am President and authorized agent for CJ Project Management, Inc. d/b/a CJ Group (CJ Group).  I have personal knowledge of the facts set forth below, and am competent and authorized to make this Affidavit.

2.      "CJ Group's mailing and physical addresses for purposes of this lien is as follows:

> CJ Project Management, Inc. d/b/a CJ Group
> 2720 Explorador
> Grand Prairie, TX 75054

3.      "A description of the property sought to be charged with this lien is as follows:

> Bridgemoor Plano
> 1100 Park Vista Road/1000 Park Vista Road
> Plano, TX 75094
> Abs A0332 M R Foster Survey
> Tract 33, 26.712 Acres
>
> and/or
>
> Park Vista Rd
> Richardson, TX 75082
> Abs A0332 M R Foster Survey
> Tract 1, 4.47 Acres
> as further described in Exhibit A attached, which is incorporated
> herein by reference for all purposes (Property).

4.      "The name and last known addresses of the owner(s) or reputed owners(s) of the Property is as follows:

| | |
|---|---|
| BSPV-Plano, LLC | BSPV-Plano, LLC |
| 2440 E. Commercial Blvd., Ste. 1 | 1301 W 25th St., Ste. 510 |
| Fort Lauderdale, FL 33308 | Austin, TX 78705 |
| | |
| BSPV-Plano, LLC | RP Shaw Investments LLC |
| 4851 Keller Springs Road, Suite 209 | 4851 Keller Springs Road, Suite 209 |
| Addison, TX 75001 | Addison, TX 75001 |

**AFFIDAVIT FOR MECHANIC'S AND MATERIALMAN'S LIEN**                                      **PAGE 1**

SEMA Investments, Inc.
1301 W 25th St., Ste. 510
Austin, TX 78705

5.    "The name and last known address of the persons by whom CJ Group was employed, or for whom CJ Group furnished labor and materials is:

North/South Building LLC                  North/South Building LLC
17103 Preston Rd., Ste. 250               4851 Keller Springs Road, Suite 209
Dallas, TX 75248                          Addison, TX 75001

CJ Group served as a subcontractor to North/South Building LLC, the general contractor.

6.    "The name and last known address of the original or general contractor(s) for the improvement on which claimant asserts a claim and lien is/are:

North/South Building LLC                  North/South Building LLC
17103 Preston Rd., Ste. 250               4851 Keller Springs Road, Suite 209
Dallas, TX 75248                          Addison, TX 75001

7.    "Upon information and belief, owner can effectively control the general contractor identified above through ownership of voting stock, interlocking directorships, or otherwise. This belief is based on records on file with the Texas Secretary of State which show common ownership or control. Therefore pursuant to Texas Property Code §53.026 owner and general contractor may be considered one and the same for purposes of CJ Group's mechanic's lien rights related to the Project.

8.    "CJ Group entered into a written AIA Document A401-2017, Standard Form of Agreement between Contractor and Subcontractor dated November 12, 2018, whereby CJ Group agreed to provide labor for siding and framing work, specifically labor, nails and equipment only in exchange for payment in the amount of $2,050,000.00 (Subcontract). The Subcontract provided for 10% retainage on progress payments. There have been change orders to the Subcontract which increase the Subcontract price in the amount of $720,017.86, making the total Subcontract price $2,770,017.86. CJ Group furnished labor and materials in the month of July and August 2020, valued at $442,013.40, as evidenced by (1) Application and Certification for Payment No. 7 dated July 24, 2020, in the amount of $340,622.10 and (2) Application and Certification for Payment No. 8 dated August 25, 2020, in the amount of $101,391.30. Contractual retainage was withheld for a period from May 2019, to August  2020, in the amount of $204,928.90, as evidenced by Application and Certification for Payment No. 8 dated August 25, 2020. True and correct copies of the unpaid payment application are attached as Exhibit B, and are incorporated herein by reference for all purposes.

9.    "A general description or statement of the labor and materials supplied by CJ Group is framing work and siding installation that includes labor, nails and equipment only, as further described in the payment application. The labor and materials were provided by CJ Group and were used in the direct performance of the work to improve the above-described Property.

AFFIDAVIT FOR MECHANIC'S AND MATERIALMAN'S LIEN                                    PAGE 2

10.     "After allowing all just and lawful offsets, payments and credits, the amount of $646,942.30 remains unpaid and is due and owing to CJ Group, which includes the amount of $442,013.40, for the labor and materials furnished to the Property during the months of July and August 2020, and the amount of $204,928.90 for the contractual retainage.

11.     "CJ Group provided notice of this claim to the Owner and General Contractor by letter dated September 4, 2020, and by letter dated September 14, 2020, sent by certified mail return receipt requested.

12.     "CJ Group hereby asserts a lien claim on the Property, and all improvements and premises thereon, pursuant to Chapter 53 of the Texas Property Code and pursuant to Article 16, Section 37 of the Texas Constitution to secure the payment of the amount claimed.  This claim is asserted against the fee simple interest and any applicable leasehold interest in the Property to the fullest extent permitted by Texas law."

Signed on the date indicated below.

Ike John Chukwura

SUBSCRIBED AND SWORN TO BEFORE ME this the 15 day of Sept, 20 20

GERARDO CEDILLO JR
NOTARY PUBLIC - STATE OF TEXAS
ID # 12446523-0
COMM. EXP. 07-16-2023

NOTARY PUBLIC, in and for the
State of Texas
My Commission Expires:_____

**AFFIDAVIT FOR MECHANIC'S AND MATERIALMAN'S LIEN**                    **PAGE 4**

# EXHIBIT A

Exhibit A

## EXHIBIT "A"

TRACT 1

BEING situated in the County of Collin, State of Texas, being a part of the M.R. Foster Survey, Abstract No. 332 and being Tract One as conveyed to Sameh Fanous by deed recorded in Volume 2464, Page 416, Deed Records, Collin County, Texas and being described by metes and bounds as follows:

BEGINNING at a found ½" steel rod at the Northwest corner of said Tract 1, said rod also being in the East line of Park Vista Road, a 40 foot roadway and being the Southwest corner of Tract 1-B as conveyed to Nancy Baker Higdon as recorded in Volume 207, Page 797 of said Deed Records;

THENCE South 88 degrees 12 minutes 11 seconds East with the South line of said Tract 1-B, a distance of 750.88 feet to a set ½" steel rod set in the Northerly right-of-way line of the Dallas Area Rapid Transit Rail Line, a 100' right-of-way;

THENCE with said right-of-way line and non tangent curve to the right having a radius of 5949.59 feet (chord bears South 55 degrees 59 minutes 36 seconds West, 249.42 feet) an arc length of 249.44 feet to a set ½ steel rod;

THENCE South 57 degrees 11 minutes 40 seconds West and continuing with said right-of-way line, a distance of 608.46 feet to a set ½" steel rod in the East line of said Park Vista Road;

THENCE with said East line the following calls and distances:

North 08 degrees 26 minutes 54 seconds West, a distance of 365.16 feet to a point,

North 09 degrees 12 minutes 54 seconds East, a distance of 133.24 feet to the Point-of-Beginning and containing 193,702 sq. ft. or 4.447 acres of land.

TRACT 2

BEING situated in the County of Collin, State of Texas, being a part of the M.R. Foster Survey, Abstract No. 332 and being Tract Two as conveyed to Sameh Fanous by deed recorded in Volume 2464, Page 416, Deed Records, Collin County, Texas and being described by metes and bounds as follows:

BEGINNING at a set ½" steel rod at the Northeast corner of said Tract 2, said rod being in the West right-of-way line of Park Vista Road, a 40' right-of-way;

THENCE South 09 degrees 12 minutes 54 seconds West with said West right-of-way, a distance of 134.24 feet to a set ½" steel rod;

0360-004-32                             August 2018 BOS Deed

Exhibit A

THENCE South 08 degrees 26 minutes 54 seconds East continuing with said West right-of-way line, a distance of 388.91 feet to a set ½" steel rod in the Northerly right-of-way line of the Dallas Area Rapid Transit Rail Line, a 100' right-of-way;

THENCE South 57 degrees 47 minutes 28 seconds West and with said right-of-way lien, a distance of 216.94 feet to a set ½" steel rod;

THENCE continuing with said right-of-way line and a curve to the right having a radius of 2153.00 feet (chord bears South 57 degrees 56 minutes 03 seconds West, 10.76 feet) an arc length of 10.76 feet to a set ½" steel rod;

THENCE South 73 degrees 34 minutes 19 seconds West, continuing along said right-of-way, a distance of 541.66 feet to point in the center of Rowlett Creek;

THENCE with the center of Rowlett Creek the following calls and distances;

North 50 degrees 35 minutes 47 seconds West, a distance of 376.39 feet to a point,
North 05 degrees 00 minutes 52 seconds East, a distance of 192.61 feet to a point,
North 79 degrees 54 minutes 12 seconds East, a distance of 93.67 feet to a point,
South 86 degrees 55 minutes 34 seconds East, a distance of 104.76 feet to a point,
North 57 degrees 27 minutes 12 seconds East, a distance of 53.72 feet to a point,
North 35 degrees 51 minutes 22 seconds West, a distance of 179.90 feet to a point,
North 02 degrees 15 minutes 17 second East, a distance of 355.22 feet to a point;
North 29 degrees 47 minutes 04 seconds East, a distance of 56.92 feet to a point;

THENCE  North 88 degrees 42 minutes 47 seconds East, a distance of 326.44 feet to set ½" steel rod at an angle point in the Southerly line of Lot 1, Block A, of the 544 Addition, an Addition to Collin County, as recorded in Volume K, Page 94, Map Records, Collin County, Texas;

THENCE North 86 degrees 51 minutes 29 seconds East with the South line of said Lot 1, a distance of 372.00 feet to a found ½" steel rod at the Southeast corner of said Lot 1;

THENCE South 88 degrees 12 minutes 11 seconds East, a distance of 603.65 feet to the PONT OF BEGINNING and containing 26.712 acres of land.

0360-004-32                              August 2018 BOS Deed

# EXHIBIT B

Exhibit B

# APPLICATION AND CERTIFICATION FOR PAYMENT    AIA DOCUMENT G702 (Instructions on reverse side)  PAGE  1  OF  2  PAGES

| TO CONTRACTOR: | PROJECT: | | APPLICATION NO:  007 | Distribution to: |
|---|---|---|---|---|
| North South Builder, LLC | | Bridgemoor Plano | | |
| 4851 Keller Springs Road, #209 | | 1100 Park Vista Road | | |
| Addison, Texas 75001 | | Plano, Texas | PERIOD TO:    7/31/20 | [x]  OWNER |
| | | | | ARCHITECT |
| FROM SUBCONTRACTOR: | OWNER: | | | |
| CJ Group **CJ Proj. Mngt, Inc | | BSPV - PLANO | | [ ]  ARCHITECT |
| 2720 Explorador | | 4851 Keller Springs Road, #209 | | [x]  CONTRACTOR |
| Grand Prairie, Texas 75054 | | Addison, Texas 75001 | PROJECT NO:    2018-002 | |
| CONTRACT FOR: | | | CONTRACT DATE: 11/12/18 | |

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.

Continuation Sheet is attached.

**SEE ATTACHED SWORN STATEMENT FROM CONTRACTOR TO OWNER**

| | | |
|---|---|---|
| 1. ORIGINAL CONTRACT SUM | $ | 2,050,000.00 |
| 2. Net change by Change Orders | $ | $720,017.86 |
| 3. CONTRACT SUM TO DATE (Line 1 ± 2) | $ | 2,770,017.86 |
| 4. TOTAL COMPLETED & STORED TO DAT | $ | 1,936,632.00 |

5. RETAINAGE:
   a. 10  % of Completed Work         $         193,663.20
      (Columns D + E on G703)

   b. 10  % of Stored Material        $              0.00
      (Column F on G703)
      Total Retainage (Lines 5a + 5b or
      Total in Column 1 of G703)      $         193,663.20

| | | |
|---|---|---|
| 6. TOTAL EARNED LESS RETAINAGE | $ | 1,742,968.80 |
| (Line 4 Less Line 5 Total) | | |
| 7. LESS PREVIOUS CERTIFICATES FOR | | |
| PAYMENT (Line 6 from prior Certificate) | $ | 1,402,346.70 |
| 8. CURRENT PAYMENT DUE | $ | 340,622.10 |
| 9. BALANCE TO FINISH, INCLUDING RETAINAGE | $ | 833,386.21 |
| (Line 3 less Lines 5 & 6) | | |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $720,017.86 | |
| Total approved this Month | | |
| TOTALS | | |
| NET CHANGES by Change Order | $720,017.86 | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief, the Work coverd by this Application for Payment has been completed in accordance with the Contract

Documents, that all amounts have been paid by the Contractor for Work which previous Certificates were issued and payments received from the Owner, and thea current payment shown herein is now due.

SUBCONTRACTOR:

By: _____    Date:_____

State of
County of:
Subscribed and sworn to before
me this          day of
                    _____
Notary Public:
My Commission expires:

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Homeowner certifies that to the best of the Homeowner's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED..........................................$ _____

By: _____    Date:_____

This Certificate is not negotiable.  The AMOUNT CERTIFIED is payable only to the Contractor named herein.  Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractot under this Contract.

Exhibit B

# CONTINUATION SHEET    AIA DOCUMENT G702

(Instructions on reverse side)   PAGE 2 OF 2 PAGE

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed certification is attached.

In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

| APPLICATION NO: | 7 |
|---|---|
| APPLICATION DATE: | 7/24/20 |
| PERIOD TO: | 7/31/20 |
| PROJECT: | 2018-002 |

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED TO DATE (D+E+F) | % (G ÷ C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| ITEM NO. | DESCRIPTION OF WORK | CONTRACT VALUE | FROM PREVIOUS APPLICATION | THIS PERIOD | | | | | |
| 0 | Mobilization | $61,500.00 | $61,500.00 | $0.00 | $0.00 | $61,500.00 | 100% | $0.00 | $6,150.00 |
| 1 | Framing - Bldg 001 (7,830 sf) | $51,091.00 | $48,597.00 | $0.00 | $0.00 | $48,597.00 | 95% | $2,494.00 | $4,859.70 |
| 2 | Framing - Bldg 002  (9,125 sf) | $59,541.00 | $56,309.00 | $0.00 | $0.00 | $56,309.00 | 95% | $3,232.00 | $5,630.90 |
| 3 | Framing - Bldg 003 - (4,550 sf) | $29,689.00 | $28,148.00 | $1,541.00 | $0.00 | $29,689.00 | 100% | $0.00 | $2,968.90 |
| 4 | Framing - Bldg 004 - (7,830 sf) | $51,091.00 | $48,697.00 | $0.00 | $0.00 | $48,697.00 | 95% | $2,394.00 | $4,869.70 |
| 5 | Framing - Bldg 005 - (9,516 sf) | $62,092.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $62,092.00 | $0.00 |
| 6 | Framing - Bldg 006 - (9,516 sf) | $62,092.00 | $49,674.64 | $0.00 | $0.00 | $49,674.64 | 80% | $12,417.36 | $4,967.46 |
| 7 | Framing - Bldg 007 - (9,516 sf) | $62,092.00 | $49,674.00 | $0.00 | $0.00 | $49,674.00 | 80% | $12,418.00 | $4,967.40 |
| 8 | Framing - Bldg 008 - (9,911 sf) | $64,670.00 | $51,737.00 | $0.00 | $0.00 | $51,737.00 | 80% | $12,933.00 | $5,173.70 |
| 9 | Framing - Bldg 009 - (9,911 sf) | $64,670.00 | $51,737.00 | $0.00 | $0.00 | $51,737.00 | 80% | $12,933.00 | $5,173.70 |
| 10 | Framing - Bldg 010 - (9,125 sf) | $59,541.00 | $47,634.00 | $0.00 | $0.00 | $47,634.00 | 80% | $11,907.00 | $4,763.40 |
| 11 | Framing - Bldg 011 - (202,041 sf) | $1,256,820.00 | $416,434.15 | $315,000.00 | $0.00 | $731,434.15 | 58% | $525,385.85 | $73,143.42 |
| 12 | Framing - Bldg 012 - (9,428 sf) | $61,518.00 | $49,252.00 | $0.00 | $0.00 | $49,252.00 | 80% | $12,266.00 | $4,925.20 |
| 13 | Framing - Bldg 013 - (9,911 sf) | $64,670.00 | $61,680.00 | $0.00 | $0.00 | $61,680.00 | 95% | $2,990.00 | $6,168.00 |
| 14 | Framing - Bldg 014 - (9,911 sf) | $64,670.00 | $51,767.00 | $0.00 | $0.00 | $51,767.00 | 80% | $12,903.00 | $5,176.70 |
| 15 | Framing - Bldg 015 - (9,911 sf) | $64,670.00 | $51,767.00 | $0.00 | $0.00 | $51,767.00 | 80% | $12,903.00 | $5,176.70 |
| 16 | Framing - Bldg 016 - (9,516 sf) | $62,092.00 | $40,209.00 | $9,465.00 | $0.00 | $49,674.00 | 80% | $12,418.00 | $4,967.40 |
| 17 | Framing - Bldg 017 - (9,125 sf) | $59,541.00 | $38,954.00 | $0.00 | $0.00 | $38,954.00 | 65% | $20,587.00 | $3,895.40 |
| 18 | Framing - Bldg 018 - (9,516 sf) | $62,092.00 | $40,209.00 | $0.00 | $0.00 | $40,209.00 | 65% | $21,883.00 | $4,020.90 |
| 19 | Framing - Bldg 019 - (4,550 sf) | $29,689.00 | $19,469.00 | $4,200.00 | $0.00 | $23,669.00 | 80% | $6,020.00 | $2,366.90 |
| 20 | Framing - Bldg 020 - (1,053 sf) | $6,871.00 | $4,500.00 | $0.00 | $0.00 | $4,500.00 | 65% | $2,371.00 | $450.00 |
| 21 | Framing - Bldg 021 - (9,516 sf) | $62,092.00 | $40,209.00 | $9,465.00 | $0.00 | $49,674.00 | 80% | $12,418.00 | $4,967.40 |
| 22 | Framing - Bldg 022 - (9,911 sf) | $64,670.00 | $41,967.00 | $9,770.00 | $0.00 | $51,737.00 | 80% | $12,933.00 | $5,173.70 |
| 23 | Framing - Bldg 023 - (9,125 sf) | $59,541.00 | $38,954.00 | $0.00 | $0.00 | $38,954.00 | 65% | $20,587.00 | $3,895.40 |
| 24 | Framing - Bldg 024 - (9,516 sf) | $62,092.00 | $40,209.00 | $9,465.00 | $0.00 | $49,674.00 | 80% | $12,418.00 | $4,967.40 |
| 25 | Framing - Bldg 025 - (9,516 sf) | $62,092.00 | $49,609.00 | $0.00 | $0.00 | $49,609.00 | 80% | $12,483.00 | $4,960.90 |
| 26 | Framing - 6 Garages/Mailbox - (8,610 sf) | $56,181.00 | $36,618.00 | $19,563.00 | $0.00 | $56,181.00 | 100% | $0.00 | $5,618.10 |
| 27 | Pre Conc Layouts - Bldg 11 (CO #1) | $42,648.21 | $42,648.21 | $0.00 | $0.00 | $42,648.21 | 100% | $0.00 | $4,264.82 |
| 28 | 87,913 Frame/Siding 677,369.65 (CO #2) Items 1-26 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | #DIV/0! | $0.00 | $0.00 |
| 29 | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | #DIV/0! | $0.00 | $0.00 |
| | TOTALS | $2,770,018.21 | $1,558,163.00 | $378,469.00 | $0.00 | $1,936,632.00 | 70% | $833,386.21 | $193,663.20 |

AIA DOCUMENT G703 · CONTINUATION SHEET FOR G702 · 1992 EDITION · AIA · © 1992
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W. WASHINGTON, D.C. 20006-5292

Exhibit B

# APPLICATION AND CERTIFICATION FOR PAYMENT
AIA DOCUMENT G702 (Instructions on reverse side) PAGE 1 OF 2 PAGES

| TO CONTRACTOR: | PROJECT: | APPLICATION NO: | 008 | Distribution to: |
|---|---|---|---|---|
| North South Builder, LLC | Bridgemoor Plano | | | |
| 4851 Keller Springs Road, #209 | 1100 Park Vista Road | | | |
| Addison, Texas 75001 | Plano, Texas | | | |

PERIOD TO:    8/31/20    [x] OWNER
ARCHITECT

FROM SUBCONTRACTOR:   OWNER:
CJ Group **CJ Proj. Mngt, Inc   BSPV - PLANO   [ ] ARCHITECT
2720 Explorador   4851 Keller Springs Road, #209   [x] CONTRACTOR
Grand Prairie, Texas 75054   Addison, Texas 75001   PROJECT NO:   2018-002

CONTRACT FOR:   CONTRACT DATE: 11/12/18

## CONTRACTOR'S APPLICATION FOR PAYMENT
Application is made for payment, as shown below, in connection with the Contract.

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief, the Work coverd by this Application for Payment has been completed in accordance with the Contract

Continuation Sheet is attached.

Documents, that all amounts have been paid by the Contractor for Work which previous Certificates were issued and payments received from the Owner, and thea current payment shown herein is now due.

**SEE ATTACHED SWORN STATEMENT FROM CONTRACTOR TO OWNER**

SUBCONTRACTOR:

| | | |
|---|---|---|
| 1. ORIGINAL CONTRACT SUM | $ | 2,050,000.00 |
| 2. Net change by Change Orders | $ | $720,017.86 |
| 3. CONTRACT SUM TO DATE (Line 1 ± 2) | $ | 2,770,017.86 |
| 4. TOTAL COMPLETED & STORED TO DAT | $ | $2,049,289.00 |

By: _____ Date:_____

5. RETAINAGE:
   a. 10 % of Completed Work   $   204,928.90
   (Columns D + E on G703)

State of
County of:
Subscribed and sworn to before

   b. 10 % of Stored Material   $   0.00
   (Column F on G703)
   Total Retainage (Lines 5a + 5b or
   Total in Column 1 of G703)   $   204,928.90

me this            day of

6. TOTAL EARNED LESS RETAINAGE   $   1,936,632.00
   (Line 4 Less Line 5 Total)

Notary Public:
My Commission expires:

7. LESS PREVIOUS CERTIFICATES FOR
   PAYMENT (Line 6 from prior Certificate)   $   1,402,346.70
8. CURRENT PAYMENT DUE   $   101,391.30
9. BALANCE TO FINISH, INCLUDING RETAINAGE   $   720,729.21
   (Line 3 less Lines 5 & 6)

### ARCHITECT'S CERTIFICATE FOR PAYMENT
In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Homeowner certifies that to the best of the Homeowner's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $720,017.86 | |
| Total approved this Month | | |
| TOTALS | | |
| NET CHANGES by Change Order | $720,017.86 | |

AMOUNT CERTIFIED...........................................$ _____

By: _____ Date:_____

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractot under this Contract.

Exhibit B

# CONTINUATION SHEET    AIA DOCUMENT G702

(Instructions on reverse side)   PAGE 2 OF 2 PAGE

| | |
|---|---|
| AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT, containing | **APPLICATION NO:** 8 |
| Contractor's signed certification is attached. | **APPLICATION DATE:** 8/25/20 |
| In tabulations below, amounts are stated to the nearest dollar. | **PERIOD TO:** 8/31/20 |
| Use Column I on Contracts where variable retainage for line items may apply. | **PROJECT:** 2018-002 |

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED TO DATE (D+E+F) | % (G ÷ C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| ITEM NO. | DESCRIPTION OF WORK | CONTRACT VALUE | FROM PREVIOUS APPLICATION | THIS PERIOD | | | | | |
| 0 | Mobilization | $61,500.00 | $61,500.00 | $0.00 | $0.00 | $61,500.00 | 100% | $0.00 | $6,150.00 |
| 1 | Framing - Bldg 001 (7,830 sf) | $51,091.00 | $48,597.00 | $2,494.00 | $0.00 | $51,091.00 | 100% | $0.00 | $5,109.10 |
| 2 | Framing - Bldg 002  (9,125 sf) | $59,541.00 | $56,309.00 | $3,232.00 | $0.00 | $59,541.00 | 100% | $0.00 | $5,954.10 |
| 3 | Framing - Bldg 003 - (4,550 sf) | $29,689.00 | $29,689.00 | $0.00 | $0.00 | $29,689.00 | 100% | $0.00 | $2,968.90 |
| 4 | Framing - Bldg 004 - (7,830 sf) | $51,091.00 | $48,697.00 | $2,394.00 | $0.00 | $51,091.00 | 100% | $0.00 | $5,109.10 |
| 5 | Framing - Bldg 005 - (9,516 sf) | $62,092.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $62,092.00 | $0.00 |
| 6 | Framing - Bldg 006 - (9,516 sf) | $62,092.00 | $49,674.64 | $0.00 | $0.00 | $49,674.64 | 80% | $12,417.36 | $4,967.46 |
| 7 | Framing - Bldg 007 - (9,516 sf) | $62,092.00 | $49,674.00 | $0.00 | $0.00 | $49,674.00 | 80% | $12,418.00 | $4,967.40 |
| 8 | Framing - Bldg 008 - (9,911 sf) | $64,670.00 | $51,737.00 | $0.00 | $0.00 | $51,737.00 | 80% | $12,933.00 | $5,173.70 |
| 9 | Framing - Bldg 009 - (9,911 sf) | $64,670.00 | $51,737.00 | $0.00 | $0.00 | $51,737.00 | 80% | $12,933.00 | $5,173.70 |
| 10 | Framing - Bldg 010 - (9,125 sf) | $59,541.00 | $47,634.00 | $0.00 | $0.00 | $47,634.00 | 80% | $11,907.00 | $4,763.40 |
| 11 | Framing - Bldg 011 - (202,041 sf) | $1,256,820.00 | $731,434.15 | $63,000.00 | $0.00 | $794,434.15 | 63% | $462,385.85 | $79,443.42 |
| 12 | Framing - Bldg 012 - (9,428 sf) | $61,518.00 | $49,252.00 | $12,266.00 | $0.00 | $61,518.00 | 100% | $0.00 | $6,151.80 |
| 13 | Framing - Bldg 013 - (9,911 sf) | $64,670.00 | $61,680.00 | $0.00 | $0.00 | $61,680.00 | 95% | $2,990.00 | $6,168.00 |
| 14 | Framing - Bldg 014 - (9,911 sf) | $64,670.00 | $51,767.00 | $0.00 | $0.00 | $51,767.00 | 80% | $12,903.00 | $5,176.70 |
| 15 | Framing - Bldg 015 - (9,911 sf) | $64,670.00 | $51,767.00 | $0.00 | $0.00 | $51,767.00 | 80% | $12,903.00 | $5,176.70 |
| 16 | Framing - Bldg 016 - (9,516 sf) | $62,092.00 | $49,674.00 | $0.00 | $0.00 | $49,674.00 | 80% | $12,418.00 | $4,967.40 |
| 17 | Framing - Bldg 017 - (9,125 sf) | $59,541.00 | $38,954.00 | $8,700.00 | $0.00 | $47,654.00 | 80% | $11,887.00 | $4,765.40 |
| 18 | Framing - Bldg 018 - (9,516 sf) | $62,092.00 | $40,209.00 | $9,500.00 | $0.00 | $49,709.00 | 80% | $12,383.00 | $4,970.90 |
| 19 | Framing - Bldg 019 - (4,550 sf) | $29,689.00 | $23,669.00 | $0.00 | $0.00 | $23,669.00 | 80% | $6,020.00 | $2,366.90 |
| 20 | Framing - Bldg 020 - (1,053 sf) | $6,871.00 | $4,500.00 | $2,371.00 | $0.00 | $6,871.00 | 100% | $0.00 | $687.10 |
| 21 | Framing - Bldg 021 - (9,516 sf) | $62,092.00 | $49,674.00 | $0.00 | $0.00 | $49,674.00 | 80% | $12,418.00 | $4,967.40 |
| 22 | Framing - Bldg 022 - (9,911 sf) | $64,670.00 | $51,737.00 | $0.00 | $0.00 | $51,737.00 | 80% | $12,933.00 | $5,173.70 |
| 23 | Framing - Bldg 023 - (9,125 sf) | $59,541.00 | $38,954.00 | $8,700.00 | $0.00 | $47,654.00 | 80% | $11,887.00 | $4,765.40 |
| 24 | Framing - Bldg 024 - (9,516 sf) | $62,092.00 | $49,674.00 | $0.00 | $0.00 | $49,674.00 | 80% | $12,418.00 | $4,967.40 |
| 25 | Framing - Bldg 025 - (9,516 sf) | $62,092.00 | $49,609.00 | $0.00 | $0.00 | $49,609.00 | 80% | $12,483.00 | $4,960.90 |
| 26 | Framing - 6 Garages/Mailbox - (8,610 sf) | $56,181.00 | $56,181.00 | $0.00 | $0.00 | $56,181.00 | 100% | $0.00 | $5,618.10 |
| 27 | Pre Conc Layouts - Bldg 11 (CO #1) | $42,648.21 | $42,648.21 | $0.00 | $0.00 | $42,648.21 | 100% | $0.00 | $4,264.82 |
| 28 | 87,913 Frame/Siding 677,369.65 (CO #2) Items 1-26 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | #DIV/0! | $0.00 | $0.00 |
| 29 | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | #DIV/0! | $0.00 | $0.00 |
| | TOTALS | $2,770,018.21 | $1,936,632.00 | $112,657.00 | $0.00 | $2,049,289.00 | 74% | $720,729.21 | $204,928.90 |

AIA DOCUMENT G703 · CONTINUATION SHEET FOR G702 · 1992 EDITION · AIA · © 1992
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W. WASHINGTON, D.C. 20006-5292

Filed and Recorded
Official Public Records
Stacey Kemp, County Clerk
Collin County, TEXAS
09/15/2020 03:34:15 PM
$74.00 NPRECELLA
20200915001562140



# EXHIBIT C

## AFFIDAVIT FOR MECHANIC'S AND MATERIALMAN'S LIEN

STATE OF TEXAS §
§
COUNTY OF HARRIS §

BEFORE ME, the undersigned authority, a Notary Public in and for the State of Texas, on this day personally appeared Ike John Chukwura, who being by me here and now duly sworn, upon oath states:

1.       "My name is Ike John Chukwura and I am President and authorized agent for CJ Project Management, Inc. d/b/a CJ Group (CJ Group).  I have personal knowledge of the facts set forth below, and am competent and authorized to make this Affidavit.

2.       "CJ Group's mailing and physical addresses for purposes of this lien is as follows:

> CJ Project Management, Inc. d/b/a CJ Group
> 2720 Explorador
> Grand Prairie, TX 75054

3.       "A description of the property sought to be charged with this lien is as follows:

> Bridgemoor Plano
> 1100 Park Vista Road/1000 Park Vista Road
> Plano, TX 75094
> Abs A0332 M R Foster Survey
> Tract 33, 26.712 Acres
>
> and/or
>
> Park Vista Rd
> Richardson, TX 75082
> Abs A0332 M R Foster Survey
> Tract 1, 4.47 Acres
> as further described in Exhibit A attached, which is incorporated herein by reference for all purposes (Property).

4.       "The name and last known addresses of the owner(s) or reputed owners(s) of the Property is as follows:

> BSPV-Plano, LLC                          BSPV-Plano, LLC
> 2440 E. Commercial Blvd., Ste. 1         1301 W 25th St., Ste. 510
> Fort Lauderdale, FL 33308                Austin, TX 78705
>
> BSPV-Plano, LLC                          RP Shaw Investments LLC
> 4851 Keller Springs Road, Suite 209      4851 Keller Springs Road, Suite 209
> Addison, TX 75001                        Addison, TX 75001

**AFFIDAVIT FOR MECHANIC'S AND MATERIALMAN'S LIEN**                                        **PAGE 1**

SEMA Investments, Inc.
1301 W 25th St., Ste. 510
Austin, TX 78705

5.      "The name and last known address of the persons by whom CJ Group was employed, or for whom CJ Group furnished labor and materials is:

North/South Building LLC                    North/South Building LLC
17103 Preston Rd., Ste. 250                 4851 Keller Springs Road, Suite 209
Dallas, TX 75248                            Addison, TX 75001

CJ Group served as a subcontractor to North/South Building LLC, the general contractor.

6.      "The name and last known address of the original or general contractor(s) for the improvement on which claimant asserts a claim and lien is/are:

North/South Building LLC                    North/South Building LLC
17103 Preston Rd., Ste. 250                 4851 Keller Springs Road, Suite 209
Dallas, TX 75248                            Addison, TX 75001

7.      "Upon information and belief, owner can effectively control the general contractor identified above through ownership of voting stock, interlocking directorships, or otherwise.  This belief is based on records on file with the Texas Secretary of State which show common ownership or control.  Therefore pursuant to Texas Property Code §53.026 owner and general contractor may be considered one and the same for purposes of CJ Group's mechanic's lien rights related to the Project.

8.      "CJ Group entered into a written AIA Document A401-2017, Standard Form of Agreement between Contractor and Subcontractor dated November 12, 2018, whereby CJ Group agreed to provide labor for siding and framing work, specifically labor, nails and equipment only in exchange for payment in the amount of $2,050,000.00 (Subcontract).  The Subcontract provided for 10% retainage on progress payments.  There have been change orders to the Subcontract which increase the Subcontract price in the amount of $1,254,435.36, making the total Subcontract price $3,304,435.36.  CJ Group furnished labor and materials in the amount of $635,576.85, which includes labor and materials provided in the month of September 2020, in the amount of $51,079.16, extended general conditions incurred from November 2019, through September 2020, in the amount of $520,940.00, and contractual retainage in the amount of $63,557.69.  A true and correct copy of the unpaid payment application is attached as <u>Exhibit B</u>, and is incorporated herein by reference for all purposes.  The amount claimed herein is in addition to the amount claimed in the Affidavit for Mechanic's and Materialman's Lien filed on September 15, 2020, and recorded as document number 20200915001562140 in the real property records of Collin County, Texas.

9.      "A general description or statement of the labor and materials supplied by CJ Group is framing work and siding installation that includes labor, nails and equipment only, as further described in the payment application.  The labor and materials were provided by CJ Group and were used in the direct performance of the work to improve the above-described Property.

**AFFIDAVIT FOR MECHANIC'S AND MATERIALMAN'S LIEN**                    **PAGE 2**

10.　　"After allowing all just and lawful offsets, payments and credits, the amount of $635,576.85 remains unpaid and is due and owing to CJ Group, which includes the amount of $51,079.16, for the labor and materials furnished to the Property during the month of September 2020, the amount of $520,940.00, for extended general conditions incurred from November 2019, through September 2020, and the amount of $63,557.69 for the contractual retainage.  The amount claimed herein is in addition to the amount claimed in the Affidavit for Mechanic's and Materialman's Lien filed on September 15, 2020, and recorded as document number 20200915001562140 in the real property records of Collin County, Texas.

11.　　"CJ Group provided notice of this claim to the Owner and General Contractor by letter dated October 14, 2020, sent by certified mail return receipt requested.

12.　　"CJ Group hereby asserts a lien claim on the Property, and all improvements and premises thereon, pursuant to Chapter 53 of the Texas Property Code and pursuant to Article 16, Section 37 of the Texas Constitution to secure the payment of the amount claimed.  This claim is asserted against the fee simple interest and any applicable leasehold interest in the Property to the fullest extent permitted by Texas law."

AFFIDAVIT FOR MECHANIC'S AND MATERIALMAN'S LIEN                                    PAGE 3

Signed on the date indicated below.

_____
Ike John Chukwura

SUBSCRIBED AND SWORN TO BEFORE ME this the 14 day of ___ October 2020, 20 20

**SONIA MONTEMAYOR**
Notary Public
STATE OF TEXAS
My Comm. Exp. 08-15-22
Notary ID # 12450790-7

_____
NOTARY PUBLIC, in and for the
State of Texas
My Commission Expires: 08-15-22

# EXHIBIT A

Exhibit A

## EXHIBIT "A"

TRACT 1

BEING situated in the County of Collin, State of Texas, being a part of the M.R. Foster Survey, Abstract No. 332 and being Tract One as conveyed to Sameh Fanous by deed recorded in Volume 2464, Page 416, Deed Records, Collin County, Texas and being described by metes and bounds as follows:

BEGINNING at a found ½" steel rod at the Northwest corner of said Tract 1, said rod also being in the East line of Park Vista Road, a 40 foot roadway and being the Southwest corner of Tract 1-B as conveyed to Nancy Baker Higdon as recorded in Volume 207, Page 797 of said Deed Records;

THENCE South 88 degrees 12 minutes 11 seconds East with the South line of said Tract 1-B, a distance of 750.88 feet to a set ½" steel rod set in the Northerly right-of-way line of the Dallas Area Rapid Transit Rail Line, a 100' right-of-way;

THENCE with said right-of-way line and non tangent curve to the right having a radius of 5949.59 feet (chord bears South 55 degrees 59 minutes 36 seconds West, 249.42 feet) an arc length of 249.44 feet to a set ½ steel rod;

THENCE South 57 degrees 11 minutes 40 seconds West and continuing with said right-of-way line, a distance of 608.46 feet to a set ½" steel rod in the East line of said Park Vista Road;

THENCE with said East line the following calls and distances:

North 08 degrees 26 minutes 54 seconds West, a distance of 365.16 feet to a point,

North 09 degrees 12 minutes 54 seconds East, a distance of 133.24 feet to the Point-of-Beginning and containing 193,702 sq. ft. or 4.447 acres of land.

TRACT 2

BEING situated in the County of Collin, State of Texas, being a part of the M.R. Foster Survey, Abstract No. 332 and being Tract Two as conveyed to Sameh Fanous by deed recorded in Volume 2464, Page 416, Deed Records, Collin County, Texas and being described by metes and bounds as follows:

BEGINNING at a set ½" steel rod at the Northeast corner of said Tract 2, said rod being in the West right-of-way line of Park Vista Road, a 40' right-of-way;

THENCE South 09 degrees 12 minutes 54 seconds West with said West right-of-way, a distance of 134.24 feet to a set ½" steel rod;

0360-004-32                              August 2018 BOS Deed

Exhibit A

THENCE South 08 degrees 26 minutes 54 seconds East continuing with said West right-of-way line, a distance of 388.91 feet to a set ½" steel rod in the Northerly right-of-way line of the Dallas Area Rapid Transit Rail Line, a 100' right-of-way;

THENCE South 57 degrees 47 minutes 28 seconds West and with said right-of-way lien, a distance of 216.94 feet to a set ½" steel rod;

THENCE continuing with said right-of-way line and a curve to the right having a radius of 2153.00 feet (chord bears South 57 degrees 56 minutes 03 seconds West, 10.76 feet) an arc length of 10.76 feet to a set ½" steel rod;

THENCE South 73 degrees 34 minutes 19 seconds West, continuing along said right-of-way, a distance of 541.66 feet to point in the center of Rowlett Creek;

THENCE with the center of Rowlett Creek the following calls and distances;

North 50 degrees 35 minutes 47 seconds West, a distance of 376.39 feet to a point,
North 05 degrees 00 minutes 52 seconds East, a distance of 192.61 feet to a point,
North 79 degrees 54 minutes 12 seconds East, a distance of 93.67 feet to a point,
South 86 degrees 55 minutes 34 seconds East, a distance of 104.76 feet to a point,
North 57 degrees 27 minutes 12 seconds East, a distance of 53.72 feet to a point,
North 35 degrees 51 minutes 22 seconds West, a distance of 179.90 feet to a point,
North 02 degrees 15 minutes 17 second East, a distance of 355.22 feet to a point;
North 29 degrees 47 minutes 04 seconds East, a distance of 56.92 feet to a point;

THENCE  North 88 degrees 42 minutes 47 seconds East, a distance of 326.44 feet to set ½" steel rod at an angle point in the Southerly line of Lot 1, Block A, of the 544 Addition, an Addition to Collin County, as recorded in Volume K, Page 94, Map Records, Collin County, Texas;

THENCE North 86 degrees 51 minutes 29 seconds East with the South line of said Lot 1, a distance of 372.00 feet to a found ½" steel rod at the Southeast corner of said Lot 1;

THENCE South 88 degrees 12 minutes 11 seconds East, a distance of 603.65 feet to the PONT OF BEGINNING and containing 26.712 acres of land.

0360-004-32                         August 2018 BOS Deed

# EXHIBIT B

Exhibit B

# APPLICATION AND CERTIFICATION FOR PAYMENT

AIA DOCUMENT G702 (Instructions on reverse side) PAGE 1 OF 2 PAGES

**TO CONTRACTOR:**
North South Builder, LLC
4851 Keller Springs Road, #209
Addison, Texas 75001

**PROJECT:**
Bridgemoor Plano
1100 Park Vista Road
Plano, Texas

**APPLICATION NO:** 009

**PERIOD TO:** 10/14/20

**Distribution to:**
☒ OWNER
☐ ARCHITECT

**FROM SUBCONTRACTOR:**
CJ Group ** CJ Proj. Mngt. Inc
2720 Explorador
Grand Prairie, Texas 75054

**OWNER:**
BSPV- PLANO
4851 Keller Springs Road, #209
Addison, Texas 75001

**PROJECT NO:** 2018-002

**CONTRACT DATE:** 11/12/18

☐ ARCHITECT
☒ CONTRACTOR

**CONTRACT FOR:**

## CONTRACTOR'S APPLICATION FOR PAYMENT
Application is made for payment, as shown below, in connection with the Contract.

Continuation Sheet is attached.

SEE ATTACHED SWORN STATEMENT FROM CONTRACTOR TO OWNER

| | | |
|---|---|---|
| 1. ORIGINAL CONTRACT SUM | $ | 2,050,000.00 |
| 2. Net change by Change Orders | $ | 1,254,435.36 |
| 3. CONTRACT SUM TO DATE (Line 1 ± 2) | $ | 3,304,435.36 |
| 4. TOTAL COMPLETED & STORED TO DATE | $ | 2,684,865.85 |
| 5. RETAINAGE: | | |
| a. 10 % of Completed Work (Columns D + E on G703) | $  268,486.59 | |
| b. 10 % of Stored Material (Column F on G703) | $  0.00 | |
| Total Retainage (Lines 5a + 5b or Total in Column 1 of G703) | $ | 268,486.59 |
| 6. TOTAL EARNED LESS RETAINAGE (Line 4 Less Line 5 Total) | $ | 2,416,379.26 |
| 7. LESS PREVIOUS CERTIFICATES FOR PAYMENT (Line 6 from prior Certificate) | $ | 1,402,346.70 |
| 8. CURRENT PAYMENT DUE | $ | 572,019.16 |
| 9. BALANCE TO FINISH, INCLUDING RETAINAGE (Line 3 less Lines 5 & 6) | | 619,569.86 |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $720,017.86 | |
| Total approved this Month | $534,417.50 | |
| TOTALS | | |
| NET CHANGES by Change Order | $1,254,435.36 | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief, the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work which previous Certificates were issued and payments received from the Owner, and that current payment shown herein is now due.

**SUBCONTRACTOR:**

By: _____ Date: _____

State of
County of:
Subscribed and sworn to before

me this _____ day of _____

Notary Public:
My Commission expires:

**ARCHITECT'S CERTIFICATE FOR PAYMENT**
In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Homeowner certifies that to the best of the Homeowner's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED..........................$ _____

By: _____ Date: _____

This Certificate is not negotiable. The Amount Certified is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

# CONTINUATION SHEET   AIA DOCUMENT G702

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

(Instructions on reverse side)   PAGE 2 OF 2 PAGE:

APPLICATION NO: 9
APPLICATION DATE: 10/11/20
PERIOD TO: 9/14/20
PROJECT: 2018-002

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | CONTRACT VALUE | WORK COMPLETED FROM PREVIOUS APPLICATION | WORK COMPLETED THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED TO DATE (D+E+F) | % (G ÷ C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| 0 | Mobilization | $61,500.00 | $61,500.00 | $0.00 | $0.00 | $61,500.00 | 100% | $0.00 | $6,150.00 |
| 1 | Framing - Bldg 001 (7,830 sf) | $51,091.00 | $51,091.00 | $0.00 | $0.00 | $51,091.00 | 100% | $0.00 | $5,109.10 |
| 2 | Framing - Bldg 002 (9,125 sf) | $59,541.00 | $59,541.00 | $0.00 | $0.00 | $59,541.00 | 100% | $0.00 | $5,954.10 |
| 3 | Framing - Bldg 003 - (4,550 sf) | $29,689.00 | $29,689.00 | $0.00 | $0.00 | $29,689.00 | 100% | $0.00 | $2,968.90 |
| 4 | Framing - Bldg 004 - (7,830 sf) | $51,091.00 | $51,091.00 | $0.00 | $0.00 | $51,091.00 | 100% | $0.00 | $5,109.10 |
| 5 | Framing - Bldg 005 - (9,516 sf) | $62,092.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $62,092.00 | $0.00 |
| 6 | Framing - Bldg 006 - (9,516 sf) | $62,092.00 | $49,674.64 | $3,725.00 | $0.00 | $53,399.64 | 86% | $8,692.36 | $5,339.96 |
| 7 | Framing - Bldg 007 - (9,516 sf) | $62,092.00 | $49,674.00 | $3,725.00 | $0.00 | $53,399.00 | 86% | $8,693.00 | $5,339.90 |
| 8 | Framing - Bldg 008 - (9,911 sf) | $64,670.00 | $51,737.00 | $3,879.00 | $0.00 | $55,616.00 | 86% | $9,054.00 | $5,561.60 |
| 9 | Framing - Bldg 009 - (9,911 sf) | $64,670.00 | $51,737.00 | $3,879.00 | $0.00 | $55,616.00 | 86% | $9,054.00 | $5,561.60 |
| 10 | Framing - Bldg 010 - (9,125 sf) | $59,541.00 | $47,634.00 | $3,571.00 | $0.00 | $51,205.00 | 86% | $8,336.00 | $5,120.50 |
| 11 | Framing - Bldg 011 - (202,041 sf) | $1,256,820.00 | $794,434.15 | $43,445.85 | $0.00 | $837,880.00 | | $418,940.00 | $83,788.00 |
| 12 | Framing - Bldg 012 - (9,428 sf) | $61,518.00 | $61,518.00 | $0.00 | $0.00 | $61,518.00 | 100% | $0.00 | $6,151.80 |
| 13 | Framing - Bldg 013 - (9,911 sf) | $64,670.00 | $61,680.00 | $2,990.00 | $0.00 | $64,670.00 | 100% | $0.00 | $6,467.00 |
| 14 | Framing - Bldg 014 - (9,911 sf) | $64,670.00 | $51,767.00 | $3,849.00 | $0.00 | $55,616.00 | 86% | $9,054.00 | $5,561.60 |
| 15 | Framing - Bldg 015 - (9,911 sf) | $64,670.00 | $51,767.00 | $3,849.00 | $0.00 | $55,616.00 | 86% | $9,054.00 | $5,561.60 |
| 16 | Framing - Bldg 016 - (9,516 sf) | $62,092.00 | $49,674.00 | $3,725.00 | $0.00 | $53,399.00 | 86% | $8,693.00 | $5,339.90 |
| 17 | Framing - Bldg 017 - (9,125 sf) | $59,541.00 | $47,654.00 | $3,551.00 | $0.00 | $51,205.00 | 86% | $8,336.00 | $5,120.50 |
| 18 | Framing - Bldg 018 - (9,516 sf) | $62,092.00 | $49,709.00 | $3,690.00 | $0.00 | $53,399.00 | 86% | $8,693.00 | $5,339.90 |
| 19 | Framing - Bldg 019 - (4,550 sf) | $29,689.00 | $23,669.00 | $1,864.00 | $0.00 | $25,533.00 | 86% | $4,156.00 | $2,553.30 |
| 20 | Framing - Bldg 020 - (1,053 sf) | $6,871.00 | $6,871.00 | $0.00 | $0.00 | $6,871.00 | 100% | $0.00 | $687.10 |
| 21 | Framing - Bldg 021 - (9,516 sf) | $62,092.00 | $49,674.00 | $3,849.00 | $0.00 | $53,523.00 | 86% | $8,569.00 | $5,352.30 |
| 22 | Framing - Bldg 022 - (9,911 sf) | $64,670.00 | $51,737.00 | $3,871.00 | $0.00 | $55,608.00 | 86% | $9,062.00 | $5,560.80 |
| 23 | Framing - Bldg 023 - (9,125 sf) | $59,541.00 | $47,654.00 | $3,551.00 | $0.00 | $51,205.00 | 86% | $8,336.00 | $5,120.50 |
| 24 | Framing - Bldg 024 - (9,516 sf) | $62,092.00 | $49,674.00 | $3,725.00 | $0.00 | $53,399.00 | 86% | $8,693.00 | $5,339.90 |
| 25 | Framing - Bldg 025 - (9,516 sf) | $62,092.00 | $49,609.00 | $3,790.00 | $0.00 | $53,399.00 | 86% | $8,693.00 | $5,339.90 |
| 26 | Framing - 6 Garages/Mailbox - (8,610 sf) | $56,181.00 | $56,181.00 | $0.00 | $0.00 | $56,181.00 | 100% | $0.00 | $5,618.10 |
| 27 | Pre Conc Layouts - Bldg. 11 (CO #1) | $42,648.21 | $42,648.21 | $0.00 | $0.00 | $42,648.21 | 100% | $0.00 | $4,264.82 |
| 28 | 87,913 Frame/Siding 677-369.65 (CO #2) Items 1-20 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | #DIV/0! | $0.00 | $0.00 |
| 29 | Change in Decking Material (CO #3) | $13,477.50 | $0.00 | $10,108.00 | $0.00 | $10,108.00 | 75% | $3,369.50 | $1,010.80 |
| 30 | Additional General Conditions (CO #4) | $520,940.00 | $0.00 | $520,940.00 | $0.00 | $520,940.00 | 100% | $0.00 | $520,094.00 |
| | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | #DIV/0! | $0.00 | $0.00 |
| | TOTALS | $3,304,435.71 | $2,049,289.00 | $635,576.85 | $0.00 | $2,684,865.85 | 81% | $619,569.86 | $268,486.59 |

AIA DOCUMENT G703   CONTINUATION SHEET FOR G702 · 1992 EDITION · AIA · © 1992
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W. WASHINGTON, D.C. 20006-5292

Filed and Recorded
Official Public Records
Stacey Kemp, County Clerk
Collin County, TEXAS
10/14/2020 03:53:14 PM
$66.00 NPRECELLA
20201014001785140

